UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
ALEJANDRA RAMALES, LAURA RODRIGUEZ,
JACINTA ANDRADE, JEFFERSON
RIVANDENEIRA, IRENE ROSADO, ELSA
SIMBANA, PEDRO DE LA CRUZ, SILVIA
ALVAREZ, NESTOR R. NUNEZ, HECTOR V.
MORALES, WENDI H. ORTIZ, LEMUEL MORALES,
LETICIA VALDEZ, DANIEL LARA, MARCELO
SORIA, MARIA CARMEN BARRERA FIGUEROA,
MARIA DARQUEA, YALILA TIGUAROJAS,
JUANA PAULINO, ROSA FERNANDEZ, VICTOR
FIGUEROA, KARINA GARCIA, JORGE TIGUA and
NELSON J.  HERNANDEZ on behalf of themselves
and all others similarly situated,

        Dkt. No.:  22-cv-2863

        **<u>COMPLAINT</u>**

        **<u>DEMAND FOR JURY TRIAL</u>**

        **Collective Action and Class
        Action Complaint**

                Plaintiffs,

        -against-

SIGNATURE   CLEANING   SERVICES,   INC.,
AMERICAN  MAINTENANCE  3  JANITORIAL
SERVICES  AND  SUPPLIES  CO.  CORP.,  and
ANDREW WEISBACH,

               Defendants.
--------------------------------------------------------------------X

      Plaintiffs ALEJANDRA RAMALES, LAURA RODRIGUEZ, JACINTA ANDRADE,

JEFFERSON RIVANDENEIRA, IRENE ROSADO, ELSA SIMBANA, PEDRO DE LA CRUZ,

SILVIA ALVAREZ, NESTOR R. NUNEZ, HECTOR V. MORALES, WENDI H. ORTIZ, a.k.a

INES VALENCIA, LEMUEL MORALES, LETICIA VALDEZ, DANIEL LARA, MARCELO

SORIA,  MARIA  CARMEN  BARRERA  FIGUEROA,  MARIA  DARQUEA,  YALILA

TIGUAROJAS,  JUANA  PAULINO,  ROSA  FERNANDEZ,  VICTOR  FIGUEROA,  KARINA

GARCIA, JORGE TIGUA and NELSON J. HERNANDEZ ("Plaintiffs"), on behalf of themselves

and all others similarly-situated ("FLSA Plaintiffs" and/or "Rule 23 Plaintiffs"), by and through

their attorneys, JOSEPH & NORINSBERG, LLC, as and for their Complaint against SIGNATURE CLEANING SERVICES, INC. ("Signature"), AMERICAN MAINTENANCE 3 JANITORIAL SERVICES AND SUPPLIES CO. CORP. ("American"), and ANDREW WEISBACH, individually (collectively, "Defendants"), allege upon knowledge as to themselves and their own actions, and upon information and belief as to all other matters as follows:

**NATURE OF CASE**

1.      Plaintiffs bring this action on behalf of themselves and all others similarly situated for Defendants' systemic and continuous violations of: (i) the overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a); (ii) the overtime provisions of the New York Labor Law ("NYLL"), NYLL § 160; N.Y. Codes R. & Regs. ("NYCRR") tit. 12, § 142-2.2; (iii) the NYLL's requirement that employers furnish employees with prompt payment for all wages owed, NYLL § 663(1); (iv) the Spread-of-Hours Requirement under New York Law, 12 NYCRR § 142-2.4; (v) the NYLL's requirement that employers furnish employees with a wage notice at hire containing specific categories of accurate information, NYLL § 195(1), as codified in the New York Wage Theft Prevention Act ("WTPA"); (vi) the NYLL's requirement that employers furnish employees with wage statements containing specific categories of accurate information on each payday, NYLL §195(3); and (vii) any other claim(s) that can be inferred from the facts set forth herein.

2.      Additionally, Plaintiffs Alejandra Ramales, Hector V. Morales, Wendi H. Ortiz, Leticia Valdez, Irene Rosado, Juana Paulino, Rosa Fernandez, Lemuel Morales, Daniel Lara and Nelson J. Hernandez bring individual claims for Defendants' discrimination and/or retaliation, including violations of: (i) the Family and Medical Leave Act of 1993 29 U.S.C. § 2601 *et. seq.* ("FMLA"); (ii) the anti-retaliation provision of the FLSA 29 U.S.C. § 215(a)(3); (iii) the anti-

retaliation provisions of NYLL § 215(1); (iv) the anti-discrimination and anti-retaliation provisions of the New York State Human Rights Law ("NYSHRL") Exec. L. § 296 et. seq., and Title 8 of the Administrative Code of the City of New York, also known as the New York City Human Rights Law ("NYCHRL"); and (v) any other claim(s) that can be inferred from the facts set forth herein.

## PRELIMINARY STATEMENT

3.     Defendants are a single enterprise comprising of Defendant Signature, which is an actual commercial cleaning company that offers businesses  a wide array of cleaning services, and Defendant American, which is a sham corporation created to hide the ownership and involvement of Defendants' principal, Defendant Weisbach, in Defendant American's business dealings. Defendants hired Plaintiffs as maintenance workers to service their customers' accounts and because they are a good fit for Defendants' workforce.  That is,  Plaintiffs are immigrants from Latin America, and most do not speak English as their first language.  Their lack of proficiency in the English language made it ideal for Defendants' unlawful compensation practices to remain undetected.  Indeed, despite recently settling a class action lawsuit for unpaid wages for $975,000.00, and despite having been sued at least three times within the last four years for wage violations, Defendants have ***continued*** to violate Plaintiffs' and other employees' rights to lawful compensation, resulting in this action.

4.     At various times between 2005 until the present date, Plaintiffs worked and continue to work as many as seven (7) days a week, and well over forty (40) hours each week — many without receiving any payment for many of their hours worked, and many without receiving overtime compensation as required by law for all hours worked over forty (40).  Defendants engaged in several willful and deliberate "schemes" which allowed them to extract the maximum amount of labor from Plaintiffs at the lowest cost to themselves.

5.      To avoid paying Plaintiffs for all the hours they worked, Defendants engaged in a pattern and practice of, *inter alia*: (i) altering Plaintiffs' time records to shave several hours off of their weekly paychecks; (ii) directing Plaintiffs to perform off-the-clock work; (iii) refusing to pay Plaintiffs for time they spent traveling between Defendants' jobsites during the workday; (iv) failing to provide uninterrupted meal breaks; and, despite that failure, (v) refusing to pay Plaintiffs for the additional hours they worked through their breaks.  Complaints against these unlawful practices are handled by Defendant Signature's principal, Defendant Weisbach, who regularly silences these complaints by telling his employees "illegals don't get overtime" and by retaliating against them.

6.      Defendants flagrantly violated the NYLL in other respects as well.  Defendant also denied Plaintiffs their legally mandated spread-of-hours pay for hours worked in excess of ten (10) hours per day. As detailed below, Defendants deliberately hid their unlawful compensation practices by failing to keep and provide complete and/or accurate records of the hours worked and wages paid to Plaintiffs.

7.      Additionally, Defendants misclassified Plaintiff Lemuel Morales, Daniel Lara, Jorge Tigua, and Nelson J. Hernandez as "Managers," and systematically failed to pay them overtime wages at a rate of one-and-one-half times their regular rate of pay for hours worked in excess of forty (40) hours per work week, despite the fact that these Plaintiffs lacked any meaningful managerial responsibilities, discretion, or authority, and that their primary job duties were at all times to perform the same maintenance work as the other Plaintiffs, and all of Defendants' hourly maintenance workers.

8.      In 2018, a class action complaint was filed in this Court arising out of the above-referenced unlawful compensation practices. *See Sanchez v. Signature Cleaning Services, Inc., et al.* (S.D.N.Y., Dkt. No. 16-cv-05994) (ER).  On January 30, 2019, the parties reached a proposed settlement for approximately 1,350 class members. But instead of submitting that agreement to this Court for review and approval, the parties dismissed that federal action and filed a new case in New York County Supreme Court on August 19, 2019, strictly for the purposes of effectuating the settlement. *See* (N.Y. County, Dkt. No. 158109/2019) (collectively the "Prior Class Action"). On February 23, 2021, the Hon. Verna L. Saunders certified the settlement class under "current and former, hourly, nonexempt maintenance workers and cleaners" and approved the settlement which released Defendants from NYLL claims arising between September 18, 2012 and July 31, 2020.

9.      But because Defendants have unconscionably continued to flout their obligations to properly pay their employees all of their earned straight-time and overtime wages, Plaintiffs now bring this lawsuit against Defendants pursuant to the collective action provisions of the FLSA, 29 U.S.C. § 216(b), on behalf of themselves individually and a Collective and Sub-Collective of all other persons similarly-situated during the applicable FLSA limitations period who suffered damages as a result of the Defendants' willful violations of the FLSA.

10.     Plaintiffs also bring this lawsuit as a class action pursuant to Federal Rule of Civil Procedure ("FRCP" ) 23, on behalf of themselves individually and a Class and Subclass of all other persons similarly-situated from August 1, 2020 onward, who suffered damages as a result of the Defendants'  violations of the NYLL and the supporting New York State Department of Labor regulations.

11.     Finally, several Plaintiffs assert claims against Defendants for discrimination and/or retaliation. Alejandra Ramales, Hector V. Morales, Wendi H. Ortiz, Leticia Valdez, Juana Paulino, Rosa Fernandez, Lemuel. Morales, Daniel Lara and Nelson J. Hernandez bring individual claims against Defendants for retaliation on various bases.

12.     First, throughout the course of the Prior Class Acton litigation, Weisbach threatened his work staff not to participate in the case.  Specifically, Weisbach and Defendants' management threatened Plaintiffs Alejandra Ramales, Hector V. Morales, Wendi H. Ortiz, Lemuel Morales, Leticia Valdez, and Rosa Fernandez with termination or other consequences if they chose to participate in the Prior Class Action. As a result, because Weisbach's and Defendants' management threats, they did not participate in the settlement.

13.     Further to that end, Defendants, through Weisbach and others at Defendant Signature, used coercive, misleading, and/or abusive tactics to force Plaintiffs and other of Defendants' employees to unknowingly sign away substantive rights. Where Plaintiffs and others refused to do so, Defendants unilaterally stripped those same rights away by unlawfully implementing policies relating to complaints and disputes without receiving knowing consent from its workforce.

14.     Defendant Weisbach has continued to retaliate against current and former employees upon learning of Plaintiffs' plan to file this instant action by threatening immediate termination or even criminal action if Plaintiffs do not "drop the suit."

15.      As another separate unlawful act, after Plaintiffs Laura Rodriguez, Juana Paulino, Rosa Fernandez, and Lemuel Morales engaged in protected activity by complaining to Defendants about their unpaid overtime, Defendants retaliated by unlawfully terminating their employment.

16.    And as yet an additional example of Defendants' heinous discrimination, Weisbach created a hostile work environment for Lemuel Morales by threatening to get him deported and making derogatory comments about his race and national origin such as: "I keep you Mexicans not to complain and work like asses." Indeed, Weisbach's threats of deportation were common, as Plaintiff Fernandez was coerced against participating in the Prior Class Action because of the very same threat even though Defendants had already terminated her employment before the Prior Class Action settlement was finally approved.

17.    Similarly, upon learning that Plaintiff Nelson J. Hernandez had become a Plaintiff in this action after working for Defendants for over twenty-four years, Defendants blatantly retaliated - - a mere two days later - - by unjustifiably terminating his employment after he requested to have his counsel present when questioned by Defendants' Human Resources Manager.

18.    And making clear that Defendants' unlawful discrimination knew no limits, Plaintiff Leticia Valdez brings individual claims against Defendants for discrimination and retaliation. Specifically, Defendants terminated Leticia Valdez's employment by refusing to reinstate her after she took protected maternity leave in January 2021.

## JURISDICTION AND VENUE

19.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action arises under 29 U.S.C. § 201 *et seq.*  The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 over all claims arising out of New York law.

20.    Venue is appropriate in this court pursuant to 28 U.S.C. § 1391(b)(1) and/or (b)(2), as one or more of the Defendants reside within this judicial district, and as a substantial part of the events or omissions giving rise to the claims for relief occurred in this judicial district.

## PARTIES

### *Plaintiffs*

21.    At all relevant times herein, Plaintiffs Alejandra Ramales ("Ms. Ramales"), Laura Rodriguez ("Ms. Rodriguez"), Jacinta Andrade ("Ms. Andrade"), Jefferson Rivandeneira ("Mr. Rivandeneira"), Irene Rosado ("Ms. Rosado"), Elsa Simbana ("Ms. Simbana"), Pedro De La Cruz ("Mr. De La Cruz"), Silvia Alvarez ("Ms. Alvarez"), Nestor R. Nunez ("Mr. Nunez"), Hector V. Morales ("Mr. V. Morales"), Wendi H. Ortiz ("Ms. Ortiz"), Lemuel Morales ("Mr. L. Morales") Leticia Valdez ("Ms. Valdez"),  Daniel Lara ("Mr. Lara"), Maria Carmen Barrera Figueroa ("Ms. Barrera"), Marcelo Soria ("Mr. Soria"), Maria Darquea ("Ms. Darquea"), Yalila Tiguarojas ("Ms. Tiguarojas"), Juana Paulino ("Ms. Paulino"), Rosa Fernandez, ("Ms. Fernandez"), Victor Figueroa ("Mr. Figueroa"), Karina Garcia ("Ms. Garcia"), Jorge A. Tigua ("Mr. Tigua") and Nelson J. Hernandez ("Mr. Hernandez") worked for Defendants in New York and were "employee(s)" entitled to the protections as defined in the FLSA, NYLL, NYCRR, WTPA and NYCHRL.

### *Defendants*

### *Signature Cleaning Services, Inc.*

22.    Defendant Signature Cleaning Services, Inc. ("Signature"), was and is a domestic corporation, with its principal place of business located at 231 West 29th Street, New York, New York.  Signature operates a commercial cleaning company that offers its customers a wide array of cleaning services.

23.    Signature employed Plaintiffs as maintenance workers and cleaners to perform work that was essential to the business operated by Signature.

24.    Plaintiffs' paystubs indicate Signature was the entity that issued their compensation during the relevant period.

***American Maintenance 3 Janitorial Services and Supplies Co. Corp***

25.     Defendant American Maintenance 3 Janitorial Services and Supplies Co. Corp ("American"), was and is a domestic corporation, with its designated address for service of process listed as 1807 Hunt Avenue, Bronx, New York, 10462, and with its principal place of business purported located at 3957 Provost Avenue, Bronx, New York 10466.

26.     As described below, together with Defendant Signature, American was and is a single enterprise and/or Plaintiffs' joint employer for any work performed on any contracts for services entered into on behalf of American.

27.     Despite executing service contracts with various clients, American used Signature's employees to perform all work, and all of American's operations were directed and controlled by Defendant Weisbach.

***Andrew Weisbach***

28.     At all times relevant herein, Defendant Andrew Weisbach ("Weisbach"), was and is an owner and/or principal and/or shareholder and/or Chief Executive Officer of Signature, and was the *de facto* Executive of Defendant American.

29.     At all relevant times, Weisbach was an overseer of the day-to-day operations of Signature.  Weisbach made both supervisory and managerial decisions for Signature and American, and at all times exhibited direct and operational control over Defendant Signature and American.

30.     Specifically, Weisbach hired Plaintiffs and unlawfully terminated many of the Plaintiffs.

31.    Moreover, Weisbach had and exercised operational control and authority over the management, supervision, and oversight of Defendant Signature's and American's affairs in general, as: Weisbach at all times is the final decisionmaker with respect to all matters of corporate governance; Signature's and American's supervisory personnel all report to Weisbach; and Weisbach had and exercised decision-making authority with respect to the *Sanchez* Prior Class Action.

32.    In addition, at all relevant times, Defendants exercised direct control over the terms and conditions of Plaintiffs' employment, in that Defendants had the power to: (i) hire and fire employees; (ii) determine rates and methods of pay; (iii) determine work schedules; (iv) supervise work and control of the employees, including the Plaintiffs herein; and (v) otherwise affect the quality of the employees' work conditions and employment.

33.    At all times relevant to this action, Defendants employ and employed two or more employees, and with respect to Defendants Signature and American, were and are a single enterprise "engaged in interstate commerce," as defined by the FLSA, because they advertise, serve, and contract with vendors from states other than New York, and Defendants' qualifying annual business exceeds $500,000.00.   That combination subjects Defendants to the FLSA's overtime requirements.

34.    Accordingly, Defendants were the "employer(s)" of Plaintiffs within the meaning of the FLSA, NYLL, NYCRR, WTPA and NYCHRL.

**PRIOR CLASS ACTION, SCOPE OF PRIOR RELEASE, AND TOLLING**

35.    On September 18, 2018, non-party Rodney Sanchez filed a class and collective action complaint against the instant Defendants, asserting claims under the FLSA for unpaid overtime, liquidated damages, and attorneys' fees, and claims under the NYLL for unpaid wages

due to time-shaving and unpaid overtime, as well as statutory penalties under the WTPA, liquidated damages, and attorneys' fees. The action was docketed as *Sanchez v. Signature Cleaning Services, Inc., et al.*, 1:28-cv-08483-AT (S.D.N.Y.) ("*Sanchez* Federal Action").

36.    On March 19, 2019, pursuant to the joint request of the parties therein, Judge Torres dismissed the *Sanchez* Federal Action without prejudice under Fed. R. Civ. P. 41(a)(1)(A).

37.    On August 19, 2019, Sanchez filed an action in Supreme Court, New York County, asserting the same claims as those found in the *Sanchez* Federal Action, docketed as *Sanchez v. Signature Cleaning Services, Inc., et al.*, Index No. 158109/2019 ("*Sanchez* State Court Action") (both *Sanchez* actions, collectively as "Prior Class Action").

38.    On October 18, 2019, Sanchez filed an unopposed motion for preliminary approval of a $975,000.00 class action settlement, resolving the Prior Class Action.

39.    The Prior Class Action's settlement included a class of "all current and former hourly, non-exempt maintenance workers and cleaners employed by Defendants between September 18, 2012 to [sic] January 30, 2019 . . . amounting to approximately 1,350 class members."

40.    The Prior Class Action included a release of all claims under the NYLL for all members of the class who did not opt-out, for the period September 18, 2012 "to the date of preliminary approval."

41.    On July 31, 2020, the Honorable Verna L. Saunders, J.S.C., entered an order in the *Sanchez* State Court Action granting preliminary approval of the Prior Class Action settlement, thereby setting the timeframe for the release of NYLL claims in Prior Class Action as September 18, 2012, through July 31, 2020.

42.     On February 23, 2021, Justice Saunders granted final approval of the Prior Class Action Settlement.

43.     As a result of the Prior Class Action: Plaintiffs and Rule 23 Plaintiffs herein who did not opt-out of the Prior Class Action are eligible to recover damages for Defendants' NYLL wage violations from August 1, 2020 onward *at a minimum*; Plaintiffs and FLSA Plaintiffs who ***did not*** affirmatively cash their settlement checks in the Prior Class Action are eligible to recover damages for Defendants' FLSA violations for the full FLSA statutory period; and Plaintiffs and FLSA Plaintiffs who affirmatively cashed their settlement checks in the Prior Class Action are eligible to recover damages for Defendants' FLSA violations from August 1, 2020 onward.

44.     During the course of the Prior Class Action, Defendants carried out a campaign of confusion and subversion wherein they misrepresented to members of the putative class and/or Plaintiffs who were then-employed, what rights they had at the time the Prior Class Action was pending in federal court, and what rights they would continue to have following the dismissal of the Prior Class Action from federal court but before conclusion of the Prior Class Action in state court.

45.     Specifically, Defendants misled then-employed Plaintiffs and members of the Prior Class Action's putative class regarding what rights they possessed when continuing to work for Defendants and/or whether they could participate in the Prior Class Action, including threats that participation therein would result in the summary termination of their employment. Defendants used these threats and false statements to attempt to strip substantive rights away from their workforce, including attempting to remove their ability to participate in future actions seeking unpaid wages, and to collect their share of any settlement in the Prior Class Action.

46.    Moreover, as a result of the Prior Class Action, the statute of limitations for Plaintiffs and putative members of the collective and class herein was tolled from September 18, 2018, through August 23, 2021 - - six months following Justice Saunders's February 23, 2021 Order granting final approval of the class settlement in the Prior Class Action.

47.    The tolling is pursuant to the Supreme Court's decision in *Artis v. District of Columbia*, 138 S. Ct. 594 (2018), and 29 U.S.C. § 1367(d), as well as the Supreme Court's decisions in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353-54 (1983), as well as the Appellate Division, Second Department's decision in *Badzio v. Americare Certified Spec. Servs., Inc.*, 177 A.D. 3d 838, 842-43 (App. Div. 2d Dep't 2019). Accordingly, the statute of limitations for Plaintiffs, FLSA Plaintiffs, and Rule 23 Plaintiffs extends back to six years predating this action's commencement under the NYLL plus an additional 1,070 days prior to same.

## COLLECTIVE ACTION ALLEGATIONS

48.    Plaintiffs Ms. Ramales, Ms. Rodriguez, Ms. Andrade, Mr. Rivandeneira, Ms. Rosado, Ms. Simbana, Mr. De La Cruz, Ms. Alvarez, Mr. Nunez, Mr. V. Morales, Ms. Ortiz, Ms. Valdez, Mr. Soria, Ms. Barrera, Ms. Darquea, Ms. Tiguarojas, Ms. Fernandez, Mr. Figueroa and Ms. Garcia seek to bring this suit to recover unpaid overtime compensation and liquidated damages from Defendants pursuant to the applicable provisions of the FLSA, 29 U.S.C. § 216(b), on behalf of themselves and on behalf of those in the following Class:

> Current and former hourly maintenance workers and cleaners and/or employees with a different title but who performed the same or similar duties as maintenance workers and cleaners, who during the applicable FLSA limitations period, performed any work for any of the Defendants, and who consent to file a claim to recover damages for: (1) overtime compensation that is legally due to them; and/or (2) liquidated damages that are legally due to them ("Hourly Worker Collective").

49.     Additionally, Plaintiffs Mr. L. Morales, Mr. Lara, Mr. Tigua, and Mr. N. Hernandez seek the same relief as the Hourly Worker Collective, on behalf of themselves and on behalf of those in the following Sub-Collective:

> Current and former salaried employees during the applicable FLSA limitations period, and worked alongside Defendants' hourly maintenance workers and cleaners and/or employees with a different title but who performed the same or similar duties as maintenance workers and cleaners maintenance workers, who performed cleaning services for any of the Defendants, and who consent to file a claim to recover damages for: (1) overtime compensation that is legally due to them; and/or (2) liquidated damages that are legally due to them ("Salaried Worker Sub-Collective") (collectively, with the Hourly Worker Collective, "FLSA Plaintiffs").

50.     Defendants treated Plaintiffs and all FLSA Plaintiffs similarly in that Plaintiffs and all FLSA Plaintiffs: (1) performed similar tasks, as described in the "Individual Allegations" section below; (2) were required to work in excess of forty hours in a workweek; and (3) were not paid the required one and one-half times their respective regular rates of pay for all hours worked per workweek in excess of forty.

51.     Additionally, Defendants treated Plaintiffs Mr. L. Morales, Mr. Lara, Mr. Tigua, and Mr. N. Hernandez and the Salaried Worker Sub-Collective similarly in that Defendants regularly scheduled all to work overtime, primarily perform janitorial services, and receive set weekly wages.   Moreover, in the Prior Class Action, Plaintiffs and both FLSA Plaintiffs Collectives formed part of a unified Class that the court certified as "non-exempt maintenance workers and cleaners."

52.     At all relevant times, Defendants are and have been aware of the requirements to pay Plaintiffs and all FLSA Plaintiffs at an amount equal to the rate of one and one-half times their respective regular rates of pay for all hours worked each workweek above forty, yet they purposefully and willfully chose and choose not to do so.

53.     There are at least 100 FLSA members, and there could be significantly more who would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join.

54.     The precise number of FLSA Plaintiffs should be readily available from a review of the Defendants' personnel, scheduling, time, and payroll records, and from input received from the collective action as part of the notice and "opt-in" process provided by 29 U.S.C § 216(b).

55.     Thus, all FLSA Plaintiffs are victims of Defendants' pervasive practice of willfully refusing to pay their employees overtime compensation for all hours worked per workweek above forty, in violation of the FLSA.

**RULE 23 CLASS ALLEGATIONS**

56.     In addition, Plaintiffs seek to maintain this action as a class action pursuant to FRCP 23(b)(3), on behalf of themselves and on behalf of those who are similarly situated who, during the applicable NYLL limitations period, were subjected to violations of the NYLL and the NYCCRR.

57.     As a result of the Prior Class Action, the applicable NYLL limitations period in this action is August 1, 2020 to the filing date of this complaint.

58.     Specifically, Plaintiffs seek certification of the following FRCP 23 Class:

> Current and former hourly maintenance workers and cleaners and/or employees with a different tittle but who have the same or similar duties as maintenance workers and cleaners, who performed any

work for any of the Defendants from August 1, 2020 onward ("Hourly New York Class").

59.    Additionally, Plaintiffs seek certification of the following FRCP 23 Subclass:

Current and former salaried employees who held the title of "manager," from August 1, 2020 onward, and who worked alongside Defendants' hourly maintenance workers and cleaners and/or employees with a different title but who performed the same or similar duties as maintenance workers and cleaners maintenance workers, who performed cleaning services for any of the Defendants in New York ("Salaried New York Class") (collectively, with Hourly New York Class, as "Rule 23 Plaintiffs").

60.    All of the requirements under FRCP(b)(3) are satisfied, as set forth below.

## Numerosity & Ascertainability

61.    During the applicable NYLL limitations period, the Defendants have, in total, employed at least 100 employees that are putative members of this class.

62.    The precise number of the Rule 23 Plaintiffs is readily ascertainable through a review of Defendants' personnel, time, and payroll records.

## Common Questions of Law and/or Fact

63.    There are questions of law and fact common to each Rule 23 Plaintiff that predominate over any questions solely affecting individual members of the FRCP 23 class, including but not limited to the following: (1) the duties that the Defendants required and require each Rule 23 Plaintiff to perform; (2) the manner of compensating each Rule 23 Plaintiff; (3) whether the Defendants failed to pay Rule 23 Plaintiffs lawful wages for all hours worked; (4) whether Rule 23 Plaintiffs worked in excess of forty hours in a week; (5) whether the Defendants failed to pay Rule 23 Plaintiffs overtime compensation of one and one-half their regular rates of pay for all hours worked in excess of forty hours in a week; (6) whether the Defendants failed to pay Rule 23 Plaintiffs the legally mandated spread-of hours pay for hours worked in excess of ten

16

hours per day; (7) whether the Defendants furnished and furnish Rule 23 Plaintiffs with accurate wage statements on each payday containing the information required by N.Y. Lab. Law § 195(3); (8) whether the Defendants furnished and furnish Rule 23 Plaintiffs with accurate wage notices upon hire containing the information required by N.Y. Lab. Law § 195(1); (9) whether the Defendants kept and maintained accurate records of hours worked by Rule 23 Plaintiffs; (10) whether the Defendants kept and maintained records with respect to the compensation that they paid to the Rule 23 Plaintiffs for each hour worked; (11) whether the Defendants have any affirmative defenses to any of the Rule 23 Plaintiffs' claims; (12) whether the Defendants' actions with respect to the Rule 23 Plaintiffs were in violation of the NYLL and supporting regulations; and (13) if so, what constitutes the proper measure of damages. In addition, there are questions of law and fact common to each New York Subclass Plaintiff that predominate over any questions solely affecting individual members of the New York Subclass with relation to Defendants' misclassification of the New York Subclass members as "manager(s)" to avoid paying them for overtime compensation and whether Defendants maintained records including payroll and scheduling.

## **Typicality of Claims and/or Defenses**

64.    As described in the "Individual Allegations" section below, the Defendants employed Plaintiffs and Rule 23 Plaintiffs within the meaning of the NYLL.  Plaintiffs' claims are typical of the claims of the Rule 23 Plaintiffs whom they seek to represent, as the Rule 23 Plaintiffs: work and/or have worked for Defendants as hourly non-managerial employees; Defendants did not pay them compensation for all hours worked; Defendants did not pay them overtime compensation of one and one-half times their regular rates of pay for all hours worked in a week over forty; Defendants did not pay them the legally mandated spread-of hours pay for hours

worked in excess of ten hours per day; Defendants did not provide them with accurate wage statements on each pay day, nor with accurate wage notices upon hire.

65.    Plaintiffs and the Rule 23 Plaintiffs enjoy the same statutory rights under the NYLL to receive overtime wages for all hours worked each week over forty hours, and to be furnished with accurate wage statements on each payday and an accurate wage notice upon hire. Plaintiffs and the Rule 23 Plaintiffs have all sustained similar types of damages as a result of the Defendants' failure to comply with the NYLL and supporting regulations.

66.    Plaintiffs and the Rule 23 Plaintiffs all have suffered injury including lack of compensation due to the Defendants' common policies, practices, and patterns of conduct. Additionally, Defendants treated New York Subclass Plaintiffs Mr. Morales and Mr. Lara and the New York Subclass in a similar manner by misclassifying them as "managers" to circumvent overtime laws and directing them to primarily perform janitorial services. Moreover, in the Prior Class Action, Plaintiffs and other New York Subclass "managers" formed part of a Class that the court certified under "non-exempt maintenance workers and cleaners…" Thus, Plaintiffs' claims and/or Defendants' defenses to those claims are typical of the Rule 23 Plaintiffs' claims and the Defendants' defenses to those claims.

**Adequacy**

67.    Plaintiffs, as described below, worked the same or similar hours as the Rule 23 Plaintiffs throughout their employment with Defendants. Defendants did not pay Plaintiffs for all hours worked, Defendants did not pay Plaintiffs' overtime pay for all hours worked over forty hours in a week, Defendants did not pay them the legally mandated spread-of hours pay for hours worked in excess of ten hours per day, and did not furnish Plaintiffs with accurate wage statements

on each payday or with any accurate wage notice upon hire, which is substantially similar to how Defendants paid and treated the Rule 23 Plaintiffs.

68.     Plaintiffs fully anticipate providing discovery responses and testifying under oath as to all of the matters raised in this Complaint and that will be raised in Defendants' Answer. Thus, Plaintiffs would properly and adequately represent the current and former employees whom Defendants have subjected to the treatment alleged herein.

69.     Additionally, Plaintiffs' counsel, Joseph & Norinsberg, LLC ("J&N"), has substantial experience in this field of law.  J&N is a well-respected litigation firm that represents Plaintiffs primarily in a wide variety of employment matters, including individual and class action litigation concerning wage and hour, discrimination, and harassment claims among others. J&N is dedicated to its clients, working tirelessly to achieve the best outcome for them, sometimes at a significant cost to the firm in terms of time, resources, and financial risk. Plaintiffs' counsel has handled hundreds of employment cases in federal districts courts, including dozens of Rule 23 class actions and FLSA collective actions.  Accordingly, Plaintiffs' counsel will fairly and adequately represent the interests of the putative class and will take all steps necessary to obtain class certification and appointment as class counsel.

**Superiority**

70.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence, effort, and expense that numerous individual actions would engender. This action will result in the orderly and expeditious administration of Class claims. Uniformity of decisions will be assured, thereby avoiding the risk of inconsistent

and varying determinations. Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

71.    There are no, or very few, material facts relating to the Rule 23 Plaintiffs' claims that are atypical of those of the putative class.  Indeed, at all relevant times herein, the Defendants treated Plaintiffs identically, or at the very least, substantially similarly, to the Rule 23 Plaintiffs.

72.    Any lawsuit brought by an hourly, non-managerial employee of the Defendants would be identical to a suit brought by any other hourly employee for the same violations.  Thus, separate litigation would risk inconsistent results.

73.    Accordingly, this means of protecting Rule 23 Plaintiffs' rights is superior to any other method, and this action is properly maintainable as a class action under FRCP 23(b)(3).

## ALLEGATIONS COMMON TO ALL CLAIMS

### *Defendants' Fraudulent Business Practices*

74.    Defendant Signature is a commercial cleaning company that provides cleaning services to businesses, non-profit organizations, and government and/or quasi-governmental agencies throughout the New York metropolitan region.

75.    Defendant Weisbach formed Defendant Signature in 1994 and has served as its Chief Executive Officer ever since.

76.    Defendant Signature employs upwards of 600 cleaners, porters, and maintenance personnel who are responsible for carrying out Defendant Signature's cleaning services.

77.    Despite its large size, Defendant Weisbach exercises near complete control over the terms and conditions of Defendant Signature's entire workforce.

78.    That is, Weisbach delegates virtually no authority to those who are nominally titled "supervisors" or "managers," instead serving as the prototypical "man behind the curtain" with respect to nearly all decisions relating to hiring, firing, job assignments, quality control, and scheduling.

79.    Weisbach often personally interviews even the lowest-level prospective employees who are under consideration for employment with Defendants.

80.    Weisbach also routinely and consistently issues explicit directives concerning firing specific employees that perform Defendants' cleaning and maintenance work.

81.    When issuing these termination directives, Weisbach regularly lodges verbal abuse that is imbued with aggressive, discriminatory animus against Hispanic individuals who are non-native English speakers.

82.    That is, despite employing a workforce that is almost uniformly Hispanic, and despite even employing "managers" and "supervisors" who themselves are also Hispanic, Weisbach frequently used racial slurs and vicious stereotypes when deciding whether and when to issue workplace discipline, up to and including termination.

83.    Specifically, Weisbach habitually lauded his own ability to force his Hispanic employees to work excessive hours for low wages - - indeed, for being able to force them to work and to pay them for fewer hours than they actually worked - - because his workers were like "asses" and they "don't ask questions, they just work."

84.    Indeed, when issuing specific directives concerning high profile accounts, Weisbach often insisted that Defendants only send workers who "could speak English" based on his misguided belief that his highest-paying and most lucrative accounts surely would not want non-English speakers performing the cleaning work.

85.    Similarly, oftentimes when issuing orders relating to termination or discipline to Defendants' 24-year "Operations Manager," Plaintiff Nelson J. Hernandez, Weisbach would use abusive language, cursing Plaintiff Hernandez over how "your people" - - referring to Hispanic workers - - could not do their jobs properly.

86.    Worse, Weisbach commonly used the racial slur "spic" when referring to Hispanic workers, on a near-daily basis, when interacting with Plaintiff Nelson Hernandez - - who was Hispanic himself, and was thus forced to endure an extremely discriminatory hostile work environment for years.

87.    But in twisted irony, despite openly discriminating against virtually his entire workforce because of their national origin / race, Defendant Weisbach nevertheless capitalized greatly on the backs of his laborers - - not only because of their tremendous work effort, but also by committing fraud.

88.    First, Defendant Weisbach used Plaintiffs, FLSA Plaintiffs, and Rule 23 Plaintiffs' labor to defraud Defendants' customers. Specifically, as described below in the Individual Allegations section, Defendant Weisbach billed Defendants' customers for a certain number of hours of cleaning services each day, while forcing Defendants' cleaners to complete the same amount of work in fewer hours. Defendants retained the profits for the billed-but-unperformed work for themselves.

89.    Second, in 2004, Defendant Weisbach created a sham corporation - - Defendant American - - and placed at the helm of this "company" Oscar Ortiz, a Hispanic male, to serve as its alleged "President."

90.    The registered corporate address for Defendant American is 1807 Hunt Avenue, Bronx, New York 10462.

91.    However, Defendant American has no actual office at this location.

92.    The actual businesses located at 1807 Hunt Avenue are a hookah lounge and a church.

93.    Defendant American has a publicly accessible website, americanmaint1807.com -- undoubtedly, the "1807" serving as a reference to its fake corporate address. On that website, however, Defendant American lists 3957 Provost Avenue, Bronx, New York 10466, as its address.

94.    The building located at 3957 Provost Avenue is a garage. While the garage does contain a sign that reads "American" – (*not* American Maintenance) – the building is operated by a plumbing company and an auto body shop.

95.    Defendant American's business materials used as part of its "cleaning" business list Defendant Weisbach and Weisbach's Signature Cleaning email address as its contact.

96.    Moreover, Defendant Weisbach is the signatory of Defendant American's contracts for services, though Defendants list Weisbach as the "Sales Executive" on these agreements.

97.    And critically, Defendant Signature's employees perform *all* of the work for any of Defendant American's contracts for services, all of which is directed by Defendant Weisbach.

98.    Defendant Weisbach created Defendant American for the sole and exclusive purpose of placing a person of color at the helm of American, enabling Weisbach to take advantage of more favorable treatment as a sham "minority-owned business."

99.    Defendants Signature and American together operate as a single enterprise and/or joint employer of Plaintiffs for all contracts under which services were performed nominally by Defendant American, but *de facto* by Defendant Signature, including, for example, contracts for services performed for the Legal Aid Society.

100.    That is, Defendants Signature and Weisbach controlled the economic realities of Defendant American, including controlling all terms and conditions of Plaintiffs' and all others similarly situated individuals' employment, specifically with respect to hiring, firing, scheduling, maintaining employment records, and determining their rates of pay and administering their pay. Specifically, all documentation relating to Plaintiffs are maintained in Defendant Signature's corporate offices, and Defendants Signature and Weisbach exercise control over all Plaintiffs' work schedules by assigning them to work various jobs staffed by Signature, even in the case of contracts for services entered into by Defendant American, thereby controlling the economic realities of their employment.

### *Defendant Weisbach's Retaliatory Campaign After Learning of this Action*

101.    Prior to filing this action, twelve of the twenty-four current Plaintiffs, through counsel, served a pre-suit demand letter upon Defendant on November 18, 2021.

102.    Over the course of several months, additional Plaintiffs joined the action, and Defendants agreed to a pre-suit mediation to explore the possibility of resolving the matter.

103.    On February 17, 2022, the parties agreed to a scheduled mediation date of May 3, 2022.

104.    Prior to the mediation, Defendant Weisbach began convening meetings with current employees that he knew to be Plaintiffs in this action. During these meetings, Weisbach threatened that Plaintiffs would be fired "if they did not drop the suit."

105.    Additionally, Defendant Weisbach shared his plans to spend upwards of "$500,000.00" to put various Plaintiffs "in jail" because of their participation in this action.

106.   That is, Defendant Weisbach routinely projected his own open and obvious theft - - both from his employees, and from his clients - - onto that of his workforce, accusing his workers of "stealing from him" on nearly a daily basis.

107.   Consistent with his intimidation tactics, Weisbach even went so far as to threaten to have Plaintiff L. Morales - - a former employee - - imprisoned due to his participation in this action.

108.   Notwithstanding Weisbach's threats, Plaintiffs refused to drop their claims and thereafter, the parties participated in a hybrid in-person and virtual mediation session on May 3, 2022.

109.   Appearing for the Plaintiffs in-person were Plaintiffs L. Morales and Nelson J. Hernandez.

110.   Appearing for the Defendants in-person were Defendant Weisbach and Defendants' Human Resources Manager, Gracie Rodriguez.

111.   The matter did not resolve at the mediation session, leading to Plaintiffs filing the instant complaint.

## **INDIVIDUAL ALLEGATIONS**

### **Alejandra Ramales**

***Defendants Willfully Failed to Pay Ms. Ramales Wages for all Hours Worked and Wages at the Mandatory Statutory Rate for the Overtime Hours***

112.   Plaintiff Ms. Ramales was employed by Defendants as a janitor from in or about February of 2009 through approximately the end of October of 2021.

113.   Throughout her employment, Ms. Ramales was directed to perform weekly cleaning services in the following New York City locations: (i) 130 Fifth Avenue, New York, N.Y.; (ii) 330 7th Avenue, New York, N.Y.; (iii) 343 East 30th Street, New York, N.Y.; (iv) 505 8th

Avenue, New York, N.Y.; and (v) 8 Rivington Street, New York, N.Y.

114.    As a designated janitor for these sites, Ms. Ramales' responsibilities included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

115.    Throughout her employment, Ms. Ramales was "technically" required to clock in and out at the beginning and end of her shift by calling an automated timekeeping service that tracked her time.  However, this timekeeping mechanism was entirely self-serving and easily manipulated, as Defendants' payroll records continuously underreported the number of hours actively worked by Ms. Ramales.

116.    The discrepancy between the actual hours Plaintiff worked and the inaccurate "official" hours reported by Defendants caused Ms. Ramales to be significantly underpaid. Specifically, Defendants engaged in a pattern and practice of shaving off at least three (3) to five (5) hours from Ms. Ramales' weekly paycheck.

117.    Additionally, Defendants refused to pay Ms. Ramales for the time she spent traveling between Defendants' worksites each week.

118.    Ms. Ramales was informed by her co-workers that, they too, were victims of the same company-wide policy: Defendants were eliminating hours from their paychecks and refusing to pay them for travel time as well.

119.    Defendants regularly directed Ms. Ramales to work nine (9) to thirteen (13) hours per day, five (5) days per week. Ms. Ramales typically worked between forty-five (45) and sixty-five (65) hours per week.

120.    Despite consistently working five (5) to twenty-five (25) hours of overtime hours each week, Ms. Ramales did not receive payment for all of her hours worked, nor did she receive overtime compensation at the statutorily-mandated rate of no less than one-and-one-half times her regular rate of pay for each hour worked in excess of forty (40) hours per week.

121.    For example, during the week of October 24 through October 30, 2021, Ms. Ramales worked 47.75 hours according to the following schedule, without any uninterrupted meal breaks, yet Defendants only paid her for 37 hours of work this week:

| MONDAY (10/25/21) | TUESDAY (10/26/21) | WEDNESDAY (10/27/21) | THURSDAY (10/28/21) | FRIDAY (10/29/21) |
|---|---|---|---|---|
| *1st Account: 343 30th Ave.* | *1st Account: 343 30th Ave.* | *1st Account: 343 30th Ave.* | *1st Account: 130 Fifth Ave.* | *1st Account: 505 8th Ave* |
| • 4:00 p.m. until 5:45 p.m. | • 5:00 p.m. until 6:45 p.m. | • 6:00 p.m. until 7:45 p.m. | • 3:00 p.m. until 6:00 p.m. | • 3:00 p.m. until 5:30 p.m. |
| *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* |
| • 5:45 p.m. until 6:15 p.m. | • 6:45 p.m. until 7:15 p.m. | • 7:45 p.m. until 8:15 p.m. | • 6:00 p.m. until 6:30 p.m. | • 5:30 p.m. until 6:00 p.m. |
| *2nd Account: 130 5th Ave.* | *2nd Account: 130 5th Ave.* | *2nd Account: 130 5th Ave* | *2nd Account: 343 30th Ave.* | *2nd Account: 343 30th Ave.* |
| • 6:15 p.m. until 10:15 p.m. | • 7:15 p.m. until 12:15 a.m. | • 8:15 p.m. until 11:15 p.m. | • 6:30 p.m. until 8:15 p.m. | • 6:00 p.m. until 7:45 p.m. |
| *Travel time to the next account:* | | *Travel time to the next account.* | *Travel time to the next account.* | *Travel time to the next account:* |
| • 10:15 p.m. until 10:45 p.m. | | • 11:15 p.m. until 11:45 p.m. | • 8:15 p.m. until 8:45 p.m. | • 7:45 p.m. until 8:15 p.m. |
| *3rd Account: 8 Rivington St.* | | *3rd Account: 8 Rivington St.* | *3rd Account: 103 5th Ave.* | *3rd Account: 130 5th Ave* |
| • 10:45 p.m. until 12:15 a.m. | | • 11:45 p.m. until 3:15 a.m. | • 8:45 p.m. until 1:45 a.m. | • 8:15 p.m. until 11:15 p.m. |
| | | | | *Travel time to the next account:* |
| | | | | • 11:15 p.m. until 11:45 p.m. |

| | | | | *4th Account:*<br>*8    Rivington St.*<br><br>• 11:45 p.m. until 3:15 a.m. |
|---|---|---|---|---|

122.    Defendants flagrantly violated the FLSA and NYLL in other respects as well.

123.    For instance, Ms. Ramales was also not compensated for the legally mandated spread-of-hours-pay for hours worked in excess of ten (10) hours a day, including for example on both Thursday October 28, 2021 and Friday October 29, 2021, in the example week described above.

124.    Further, Ms. Ramales was routinely denied her required meal break.  When she did on rare occasion take a break to eat, Defendants would interrupt her and demand that she resume working.  Defendants would then fail to compensate her for the additional hours worked.

125.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, her actual hours worked for that week.

126.    Defendants also intentionally did not provide Plaintiff with a wage notice at the time of her hire that accurately contained, *inter alia*, Plaintiff's rates of pay as designated by Defendants.

127.    Ms. Ramales did not participate in the previous class action for unpaid overtime against Defendants because principal Weisbach threatened to terminate her employment if she joined.

## Laura Rodriguez

***Defendants Willfully Failed to Pay Ms. Rodriguez Wages for all Hours Worked and Wages at the Mandatory Statutory Rate for the Overtime Hours***

128.    Plaintiff Ms. Rodriguez was employed by Defendants as a porter from November 10, 2020 to October 15, 2021.[1]

129.    Throughout her employment, Ms. Rodriguez was directed to perform weekly cleaning services in the following New York City locations: (i) 432 West 39th Street; (ii) 443 Park Avenue; (iii) 30 Park Avenue; and (iv) 227 West Street.

130.    As a designated porter for these sites, Ms. Rodriguez's responsibilities included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

131.    Throughout her employment, Ms. Rodriguez was "technically" required to clock in and out at the beginning and end of her shift by calling an automated timekeeping service that tracked her time.  However, this timekeeping mechanism was entirely self-serving and easily manipulated, as Defendants' payroll records continuously underreported the number of hours actively worked by Ms. Rodriguez.

132.    The discrepancy between the actual hours Plaintiff worked and the inaccurate "official" hours reported by Defendants caused Ms. Rodriguez to be significantly underpaid. Specifically, Defendants engaged in a pattern and practice of shaving off three (3) to five (5) hours from Ms. Rodriguez' weekly paycheck.

---

[1] Ms. Rodriguez began working for Defendants subsequent to the class period in the Prior Class Action and was therefore not eligible to participate in that settlement.

133.    Defendants regularly required Ms. Rodriguez to work seven (7) to twelve (12) hours per day, five (5) days per week, working an average of thirty-five (35) to fifty-five (55) hours per week.

134.    Despite regularly working an average of fifteen (15) hours of overtime each week, Ms. Rodriguez did not receive any payment for many of the hours she worked, and for those hours that Defendants *did* pay her over forty, Defendants never paid her at the statutorily-mandated rate of no less than one-and-one-half times her regular rate of pay for each hour worked in excess of forty (40) hours per week.

135.    Additionally, Defendants refused to pay Ms. Rodriguez for the time she spent traveling between Defendants' worksites each week.

136.    For example, during the week of July 26 through August 1, 2021, Defendants required Ms. Rodriguez to work, worked 56.5 hours according to the following schedule, without any uninterrupted meal breaks, yet Defendants only paid her for 51.25 hours of work this week:

| MONDAY (7/26/21) | TUESDAY (7/27/21) | WEDNESDAY (7/28/21) | THURSDAY (7/29/21) | FRIDAY (7/30/21) |
|---|---|---|---|---|
| *1st Account: 432 West 39th Street* | *1st Account: 432 West 39th Street* | *1st Account: 432 West 39th Street* | *1st Account: 432 West 39th Street* | *1st Account: 432 West 39th Street* |
| • 3:00 p.m. until 10:30 p.m. | • 3:00 p.m. until 10:30 p.m. | • 3:00 p.m. until 10:30 p.m. | • 3:00 p.m. until 10:30 p.m. | • 3:00 p.m. until 7:30 p.m. |
| *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account* | *Travel time to the next account* |
| • 10:30 p.m. until 11:00 p.m. | • 10:30 p.m. until 11:00 p.m. | • 10:30 p.m. until 11:00 p.m. | • 10:30 p.m. until 11:00 p.m. | • 7:30 p.m. until 8:00 p.m. |
| *2nd Account: 443 Park Ave S.* | *2nd Account: 443 Park Ave S.* | *2nd Account: 443 Park Ave S.* | *2nd Account: 443 Park Ave S.* | *2nd Account: 227 West Street* |
| • 11:00 p.m. until 1:00 a.m. | • 11:00 p.m. until 2:00 a.m. | • 11:00 p.m. until 2:00 a.m. | • 11:00 p.m. until 2:00 a.m. | • 8:00 p.m. until 2:00 a.m. |
| *Travel time to the next account:* | | | | |

| | | | | |
|---|---|---|---|---|
| • 1:00 a.m. until 1:30 a.m.<br><br>**3rd Account: 30th Park Ave**<br><br>• 1:30 a.m. until 3:30 a.m. | | | | |

137.    To avoid detection for stealing Ms. Rodriguez's wages, Defendants would often split Ms. Rodriguez's wages up into multiple checks and never pay her any overtime compensation of one and one-half times her regular rate of pay.

138.    For example, for the week above in which Ms. Rodriguez worked 56.5 hours, Defendants only compensated her for 51.25 hours.  Defendants split Ms. Rodriguez' compensation into two check payments: one check for 38.75 hours of pay, and a second check for 12.50 hours of pay.  Ms. Rodriguez exclusively received her straight time rate of $15.00 per hour for these 51.25 hours, and no compensation whatsoever for the additional 4.25 hours that she worked.

139.    Defendants flagrantly violated the FLSA and NYLL in other respects as well.

140.    For instance, Ms. Rodriguez was also not compensated for the legally mandated spread-of-hours-pay for hours worked in excess of ten (10) hours a day, including for all five days in the example week described above.

141.    Further, Ms. Rodriguez was routinely denied her required meal break.   When she did, on rare occasion take a break to eat, Defendants would interrupt her and demand that she resume working.  Defendants would then fail to compensate her for the additional hours worked.

142.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, her actual hours worked for that week.

143.    Defendants also intentionally did not provide Plaintiff with a wage notice at the time of her hire that accurately contained, *inter alia*, Plaintiff's rates of pay as designated by Defendants.

***Defendants' Unlawful Retaliation Against Ms. Rodriguez***

144.    Ms. Rodriguez regularly complained to her supervisor and Defendants' Human Resources Department about Defendants' unlawful compensation practices.

145.    In August of 2021, Ms. Rodriguez complained to Defendants' principal  Weisbach about missing hours.  In response, Weisbach told Ms. Rodriguez "you don't work fast enough" and "if you don't like it, feel free to go."

146.    Shortly after, Ms. Rodriguez' situation at work began to rapidly deteriorate. Specifically, Weisbach began to regularly reprimand Ms. Rodriguez about her work performance.

147.    Over the course of the next two months, Defendants relentlessly pressured Ms. Rodriguez to increase her speed at work.

148.    In October of 2021, Defendants falsely accused Ms. Rodriguez of wage theft.  Then, on October 15, 2021, Defendants terminated Ms. Rodriguez.

149.    Given Defendants' treatment of Ms. Rodriguez since August of 2021 — including pressuring her to work faster and reprimanding her for things that had never before been an issue — it is evident that Defendants terminated Ms. Rodriguez in retaliation for her request to be paid overtime.

### **Jacinta Andrade**

***Defendants Willfully Failed to Pay Ms. Andrade Wages for all Hours Worked and Wages at the Mandatory Statutory Rate for the Overtime Hours***

150.    Plaintiff Ms. Andrade has been employed by Defendants as a porter since on or about June of  2000.  She is a current employee of Defendants.

151.    Throughout her employment, Ms. Andrade has been directed to perform weekly cleaning services in the following locations: (i) 2090 Adam Clayton Powell Jr. Blvd, New York, New York; (ii) 31-60 21st Street, Astoria New York; and (iii)122 West 69th Street, New York, New York.

152.    As a designated porter for these sites, Ms. Andrade's responsibilities have included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

153.    Throughout her employment, Ms. Andrade was "technically" required to clock in and out at the beginning and end of her shift by calling an automated timekeeping service that tracked her time.  However, Defendants' timekeeping mechanism was entirely self-serving and easily manipulated, as Defendants' payroll records continuously underreported the number of hours actively worked by Ms. Andrade.

154.    The discrepancy between the actual hours Plaintiff worked and the inaccurate "official" hours reported by Defendants caused Ms. Andrade to be significantly underpaid. Specifically, Defendants engaged in a pattern and practice of shaving off of three (3) to five (5) hours from Ms. Andrade's weekly paycheck.

155.    Defendants regularly required Ms. Andrade to work ten (10) hours per day, five (5) days per week, working an average of 50 hours per week.

156.    Despite regularly working an average of ten (10) hours of overtime each week, Ms. Andrade did not receive any payment for many of the hours she worked, and for those hours that Defendants *did* pay her over forty, Defendants never paid her at the statutorily-mandated rate of

no less than one-and-one-half times her regular rate of pay for each hour worked in excess of forty (40) hours per week.

157.     Additionally, Defendants refused to pay Ms. Andrade for the time she spent traveling between Defendants' worksites each week.

158.     For example, during the week of September 26, 2021, Defendants required Ms. Andrade to work, worked 50 hours according to the following schedule, without any uninterrupted meal breaks, yet Defendants only paid her for approximately 37.75 hours of work this week:

| MONDAY (9/27/21) | TUESDAY (9/28/21) | WEDNESDAY (9/30/21) | THURSDAY (9/30/21) | FRIDAY (10/1/21) |
|---|---|---|---|---|
| *1st Account: 122 West 69th St* | *1st Account: 122 West 69th St* | *1st Account: 122 West 69th St* | *1st Account: 122 West 69th St* | *1st Account: 122 West 69th St* |
| • 5:00 p.m. until 9:00 p.m. | • 5:00 p.m. until 9:00 p.m. | • 5:00 p.m. until 9:00 p.m. | • 5:00 p.m. until 9:00 p.m. | • 5:00 p.m. until 9:00 p.m. |
| *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* |
| • 9:00 p.m. until 10:00 p.m. | • 9:00 p.m. until 10:00 p.m. | • 9:00 p.m. until 10:00 p.m. | • 9:00 p.m. until 10:00 p.m. | • 9:00 p.m. until 10:00 p.m. |
| *2nd Account: 31-601 St* | *2nd Account: 31-611 St* | *2nd Account: 31-621 St* | *2nd Account: 31-631 St* | *2nd Account: 31-641 St* |
| • 10:00 p.m. until 12:00 a.m. | • 10:00 p.m. until 12:00 a.m. | • 10:00 p.m. until 12:00 a.m. | • 10:00 p.m. until 12:00 a.m. | • 10:00 p.m. until 12:00 a.m. |
| *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* |
| • 12:00 a.m. until 1:00 a.m. | • 12:00 a.m. until 1:00 a.m. | • 12:00 a.m. until 1:00 a.m. | • 12:00 a.m. until 1:00 a.m. | • 12:00 a.m. until 1:00 a.m. |
| *3rd Account: 122 West 69th St.* | *3rd Account: 122 West 69th St.* | *3rd Account: 122 West 69th St.* | *3rd Account: 122 West 69th St.* | *3rd Account: 122 West 69th St.* |
| • 1:00 a.m. until 3:00 a.m. | • 1:00 a.m. until 3:00 a.m. | • 1:00 a.m. until 3:00 a.m. | • 1:00 a.m. until 3:00 a.m. | • 1:00 a.m. until 3:00 a.m. |

159.     Defendants flagrantly violated the FLSA and NYLL in other respects as well.

160.    For instance, Ms. Andrade was also not compensated for the legally mandated spread-of-hours-pay for hours worked in excess of ten (10) hours a day, including for all five days in the example week described above.

161.    Further, Ms. Andrade was routinely denied her required meal break.    When she did, on rare occasion take a break to eat, Defendants would interrupt her and demand that she resume working.  Defendants would then fail to compensate her for the additional hours worked.

162.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, her actual hours worked for that week.

163.    Defendants also intentionally did not provide Plaintiff with a wage notice at the time of her hire that accurately contained, *inter alia*, Plaintiff's rates of pay as designated by Defendants.

164.    Ms. Andrade participated in the previous class action for unpaid overtime against Defendants.  Limited by the foregoing, Ms. Andrade may recover damages from Defendants in this action from August of 2020 onward.

## Jefferson Rivandeneira

***Defendants Willfully Failed to Pay Mr. Rivandeneira Wages for all Hours Worked and Wages at the Mandatory Statutory Rate for the Overtime Hours***

165.    Plaintiff Mr. Rivandeneira was employed by Defendants as a porter from on or about March of 2012 to in or about late October of 2021.

166.    Throughout his employment, Mr. Rivandeneira was directed to perform weekly cleaning services in the following locations: (i) 2090 Adam Clayton Powell Jr. Blvd, New York, New York; (ii) 31-60 21st Street, Astoria New York; (iii)122 West 69th Street, New York, New York; and (iv) 211 West 71st Street, New York, New York.

167.    As a designated porter for these sites, Mr. Rivandeneira's responsibilities included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

168.    Throughout his employment, Mr. Rivandeneira was "technically" required to clock in and out at the beginning and end of his shift by calling an automated timekeeping service that tracked his time.  However, this timekeeping mechanism was entirely self-serving and easily manipulated, as Defendants' payroll records continuously underreported the number of hours actively worked by Mr. Rivandeneira.

169.    The discrepancy between the actual hours Plaintiff worked and the inaccurate "official" hours reported by Defendants caused Mr. Rivandeneira to be significantly underpaid. Specifically, Defendants engaged in a pattern and practice of shaving off of three (3) to five (5) hours from Mr. Rivandeneira's weekly paycheck.

170.    Defendants regularly required Mr. Rivandeneira to work nine (9) to fourteen (14) hours per day, five (5) days per week, working an average of fifty (50) hours per week.

171.    Despite regularly working an average of ten (10) hours of overtime each week, Mr. Rivandeneira did not receive any payment for many of the hours he worked, and for those hours that Defendants *did* pay him over forty, Defendants never paid him at the statutorily-mandated rate of no less than one-and-one-half times his regular rate of pay for each hour worked in excess of forty (40) hours per week.

172.    Additionally, Defendants refused to pay Mr. Rivandeneira for the time he spent traveling between Defendants' worksites each week.

173.    For example, during the week of September 12, 2021, Defendants required Mr.
Rivandeneira was to work, worked 59 hours according to the following schedule, without any
uninterrupted meal breaks, yet Defendants only paid him for approximately 35 hours of work this
week:

| MONDAY (9/13/21) | TUESDAY (9/14/21) | WEDNESDAY (9/15/21) | THURSDAY (9/16/21) | FRIDAY (9/17/21) |
|---|---|---|---|---|
| *1st Account: 122 West 69th St* | *1st Account: 122 West 69th St* | *1st Account: 122 West 69th St* | *1st Account: 122 West 69th St* | *1st Account: 122 West 69th St* |
| • 5:00 p.m. until 7:00 p.m. | • 5:00 p.m. until 7:00 p.m. | • 5:00 p.m. until 7:00 p.m. | • 5:00 p.m. until 7:00 p.m. | • 5:00 p.m. until 7:00 p.m. |
| *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* |
| • 7:00 p.m. until 8:00 p.m. | • 7:00 p.m. until 8:00 p.m. | • 7:00 p.m. until 8:00 p.m. | • 7:00 p.m. until 8:00 p.m. | • 7:00 p.m. until 8:00 p.m. |
| *2nd Account: 31-651 St* | *2nd Account: 31-661 St* | *2nd Account: 31-671 St* | *2nd Account: 31-681 St* | *2nd Account: 31-691 St* |
| • 8:00 p.m. until 10:00 a.m. | • 8:00 p.m. until 10:00 a.m. | • 8:00 p.m. until 10:00 a.m. | • 8:00 p.m. until 10:00 a.m. | • 8:00 p.m. until 10:00 a.m. |
| *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* | *Travel time to the next account:* |
| • 11:00 p.m. until 12:00 a.m. | • 11:00 p.m. until 12:00 a.m. | • 11:00 p.m. until 12:00 a.m. | • 11:00 p.m. until 12:00 a.m. | • 11:00 p.m. until 12:00 a.m. |
| *3rd Account: 122 West 69th St.* | *3rd Account: 211 West 71* | *3rd Account: 122 West 69th St.* | *3rd Account: 122 West 69th St.* | *3rd Account: 211 West 71* |
| • 12:00 a.m. until 4:00 a.m. | • 12:00 am until 5:00 am | • 12:00 a.m. until 3:00 a.m. | • 12:00 a.m. until 3:00 a.m. | • 12:00 am until 5:00 am |
| | *Travel time to the next account:* | | | *Travel time to the next account:* |
| | 5:00 am until 5:10am | | | 5:00 am until 5:10am |
| | *4th Account: 122 West 69th St.* <br> • 5:10 a.m. until 7:00 a.m. | | | *4th Account: 122 West 69th St.* <br> • 5:10 a.m. until 7:00 a.m. |

174.    Defendants flagrantly violated the FLSA and NYLL in other respects as well.

37

175.    For instance, Mr. Rivandeneira was also not compensated for the legally mandated spread-of-hours-pay for hours worked in excess of ten (10) hours a day, including for all five days in the example week described above.

176.    Further, Mr. Rivandeneira was routinely denied his required meal break.  When he did, on rare occasion take a break to eat, Defendants would interrupt him and demand that he resume working.  Defendants would then fail to compensate him for the additional hours worked.

177.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, his actual hours worked for that week.

178.    Defendants also intentionally did not provide Plaintiff with a wage notice at the time of his hire that accurately contained, *inter alia*, Plaintiff's rates of pay as designated by Defendants.

179.    Mr. Rivandeneira participated in the previous class action for unpaid overtime against Defendants.  Limited by the foregoing, Mr. Rivandeneira may recover damages from Defendants in this action from August of 2020 onward.

## <u>Irene Rosado</u>

***Defendants Willfully Failed to Pay Ms. Rosado Wages for all Hours Worked and Wages at the Mandatory Statutory Rate for the Overtime Hours***

180.    Plaintiff Ms. Rosado was employed by Defendants as a porter from on or about of September 16, 2019 to in or about May 2021.

181.    Throughout her employment, Ms. Rosado was directed to perform weekly cleaning services at various locations.

182.    As a designated porter for these sites, Ms. Rosado' s responsibilities included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other

common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

183.    Throughout her employment, Ms. Rosado was "technically" required to clock in and out at the beginning and end of her shift by using the company's mobile application and/or calling an automated timekeeping service that tracked her time.  However, this timekeeping mechanism was entirely self-serving and easily manipulated, as Defendants' payroll records continuously underreported the number of hours actively worked by Ms. Rosado.

184.    The discrepancy between the actual hours Ms. Rosado worked and the inaccurate "official" hours reported by Defendants caused Ms. Rosado to be significantly underpaid. Specifically, during the time periods referenced below, Defendants engaged in a pattern and practice of shaving off of up to thirteen hours from Ms. Rosado's weekly paycheck.

185.    From approximately September 2019 to March 2020, Defendants regularly required Ms. Rosado to work nine (9) hours per day, five (5) per week, working an average of forty-five (45) hours per week.

186.    During this period, Ms. Rosado did not receive payment for all the hours she worked. Specifically, Defendants arbitrarily limited Plaintiff's compensation to thirty-two (32) hours, regardless of the number of hours she actually worked each week.

187.    During the aforementioned period, Defendants also refused to pay Ms. Rosado for approximately thirty (30) to forty-five (45) minutes she spent traveling between worksites each day.

188.    From approximately March 2020 to end of July 2020, Defendants assigned Ms. Rosado to service their account with the NY Presbyterian Hospital and a Charter School, respectively, in the New York City (collectively "Sites").

189.    While working at the sites, Ms. Rosado did not receive payment for all the hours she worked. Specifically, Defendants arbitrarily limited Plaintiff's compensation to thirty-seven hours, regardless of the number of hours she actually worked each week.

190.    To conceal their unlawful compensation practice, Defendants adjusted Ms. Rosado's time entries to match her compensation.

191.    Defendants directed and continue to direct Ms. Rosado to work nine (9) hours per day, five (5) days per week, working an average of forty-five (45) hours per week.

192.    For example, Defendants required Ms. Rosado to work, forty-five (45) hours according to the company issued schedule, yet Defendants only paid her for thirty-two (32) hours of work for the week.

193.    Again, from approximately August 2020 to January 2021, Defendants regularly required Ms. Rosado to work nine (9) hours per day, five 5 days per week, working an average of forty-five (45) hours per week.

194.    During the aforementioned period Defendants refused to pay Ms. Rosado for approximately thirty (30) to forty-five (45) minutes she spent traveling between worksites each day.

195.    Throughout her tenure, Ms. Rosado lodged a series of complaints about the missing hours on her paycheck to her manager Jose Fernandez. Instead of taking corrective action, Weisbach directed Jose Fernandez to ignore Ms. Rosado's complaints and reassign her to a new job location against her wishes as retaliation for her complaints.

196.    Specifically in January and February 2021, Ms. Rosado made a series of complaints regarding her wages. This time, Weisbach directed Jose Fernandez to retaliate by moving Ms. Rosado to a new position against her wishes. Weisbach directed Jose Fernandez to further retaliate by claiming that she would work now only forty (40) hours per week. As a result, Ms. Rosado was assigned to the NY Presbyterian Hospital where she worked from 3pm to 11pm but without any breaks, for five days each week. Nevertheless, proving past was prologue, Defendants still automatically deducted an hour from Ms. Rosado's paycheck.

197.    From March 2021 to May 2021 Ms. Rosado did not receive payment for all the hours she worked. Specifically, Defendants continued to arbitrarily limit Plaintiff's compensation to thirty-two (32) hours, although she was working now 40 hours per week.

198.    Defendants flagrantly violated the FLSA and NYLL in other respects as well.

199.    On each occasion when Defendants paid Ms. Rosado, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, her actual hours worked for that week.

200.    Defendants also intentionally did not provide Ms. Rosado with a wage notice at the time of her hire that accurately contained, *inter alia*, Plaintiff's rates of pay as designated by Defendants.

201.    Ms. Rosado did not participate in the Prior Class Action settlement because she never received notice of same.

***Defendants Retaliate Against Ms. Rosado for Her Complaints about Unpaid Wages***

202.    As previously noted above, Ms. Rosado engaged in protected activity throughout her tenure. However, in May 2021, Ms. Rosado again complained about her missing hours, in response to her Complaint, Jose Fernandez drew a line in the sand and told Ms. Rosado "leave or learn from your mistakes".

203.    As a result of Defendants response and not getting paid all her wages, and Defendants further refusal to pay Ms. Rosado for her wages despite now paying her for *even fewer* hours of work each week, Defendants constructively discharged Ms. Rosado's employment.

## Elsa Simbana

***Defendants Willfully Failed to Pay Ms. Simbana Wages for all the Hours She Worked***

204.    Plaintiff Ms. Simbana has worked for Defendants as a janitor since on or about February of 2014.  She is a current employee of Defendants.

205.    As a janitor, Ms. Simbana's responsibilities include, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors and shampooing carpets;(v) removing potentially medical hazardous waste; and (vi) removing and recycling garbage.

206.    Defendants assigned Ms. Simbana to service their account with Weill Cornell Medical located at 425 East 61st Street, New York, New York ("Site").  Specifically, Ms. Simbana performed cleaning services in the following site areas:

- 4th Floor: Plaintiff serviced 5 rooms, 1 long hallway, 1 large waiting area and 1 bathroom.

- 8th Floor: Plaintiff serviced 15 rooms, 2 long hallways, 1 cubicle area, 1 waiting

area and 7 bathrooms.

- 10th Floor: Plaintiff serviced 16 rooms, 1 long hallway, 1 large waiting area and 5 bathrooms.

- 12th Floor:  Plaintiff serviced 2 long hallways, 1 waiting area and 1 bathroom.

- Penthouse:  Plaintiff serviced 47 rooms, 2 long hallways, 1 waiting area and 5 bathrooms.

207.    Despite handling such a large account for Defendants, Ms. Simbana did not receive payment for all the hours she worked. Specifically, Defendants arbitrarily limited Plaintiff's compensation to twenty-four (24) hours, regardless of the number of hours she actually worked each week.

208.    To conceal their unlawful compensation practice, Defendants adjusted Ms. Simbana's time entries to match her compensation.  Consequentially, Ms. Simbana was regularly required to perform off-the-clock unpaid work.

209.    Defendants directed and continue to direct Ms. Simbana to work six (6) to seven (7) hours per day, five (5) days per week, working an average of between thirty (30) and thirty-five (35) hours per week.

210.    For example, during the week of October 24 through October 30, 2021, Defendants required Ms. Simbana to work, and Ms. Simbana did in fact work 32.5 hours according to the following schedule, without any uninterrupted meal breaks, yet Defendants only paid her for twenty-four (24) hours of work this week:

| | |
|---|---|
| Sunday, October 24, 2021: | off |
| Monday, October 25, 2021: | from 3:30 p.m. until 10:00 p.m. |
| Tuesday, October 26, 2021: | from 3:30 p.m. until 10:00 p.m. |
| Wednesday, October 27, 2021: | from 3:30 p.m. until 10:00 p.m. |
| Thursday, October 28, 2021 | from 3:30 p.m. until 10:00 p.m. |
| Friday, October 29, 2021: | from 3:30 p.m. until 10:00 p.m. |

Saturday, October 30, 2021:                off

211.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, her actual hours worked for that week.

212.    Ms. Simbana participated in the previous class action for unpaid overtime against Defendants.  Limited by the foregoing, Ms. Simbana may recover damages from Defendants in this action from August of 2020 onward.

### Pedro De La Cruz

***Defendants Willfully Failed to Pay Mr. De La Cruz Wages for all the Hours he Worked***

213.    Plaintiff Mr. De La Cruz has worked for Defendants as a janitor since on about February of 2014.  He is a current employee of Defendants.

214.    As a janitor, Mr. De La Cruz's responsibilities include, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors and shampooing carpets; and (v) removing potentially medical hazardous waste and taking out the garbage.

215.    Defendants assigned Mr. De La Cruz to service their account with Weill Cornell Medical located at 425 East 61st Street, New York, New York ("Site").  Specifically, Mr. De La Cruz performed cleaning services in the following site areas:

- 4th Floor: Plaintiff serviced 5 rooms, 1 long hallway, 1 large waiting area and 1 bathroom.

- 8th Floor: Plaintiff serviced 15 rooms, 2 long hallways, 1 cubicle area, 1 waiting area and 7 bathrooms.

- 10th Floor: Plaintiff serviced16 rooms, 1 long hallway, 1 large waiting area and 5

bathrooms.

- 12th Floor:  Plaintiff serviced 2 long hallways, 1 waiting area and 1 bathroom.

- Penthouse:   Plaintiff serviced 47 rooms, 2 long hallways, 1 waiting area and 5 bathrooms.

216.    Despite handling such a large account for Defendants, Mr. De La Cruz did not receive payment for all the hours he worked. Specifically, Defendants arbitrarily limited Plaintiff's compensation to thirty-three (33) hours, regardless of the number of hours he actually worked.

217.    To conceal their unlawful compensation practice, Defendants adjusted his time entries to match his compensation.  Consequently, Mr. De La Cruz was regularly directed to perform unpaid off-the-clock work.

218.    Defendants directed and continue to direct Mr. De La Cruz to work seven (7) to eight (8) hours per day, five (5) days per week, working an average of thirty-five (38) hours per week.

219.    For example, during the week of October 24 through October 30, 2021, Defendants required Mr. De La Cruz to work, and Mr. De La Cruz did in fact work worked 37.5 hours according to the following schedule, without any uninterrupted meal breaks, yet Defendants only paid him for thirty-three (33) hours of work this week:

| | |
|---|---|
| Sunday, October 24, 2021: | off |
| Monday, October 25, 2021: | from 3:00 p.m. until 10:30 p.m. |
| Tuesday, October 26, 2021: | from 3:00 p.m. until 10:30 p.m. |
| Wednesday, October 27, 2021: | from 3:00 p.m. until 10:30 p.m. |
| Thursday, October 28, 2021 | from 3:00 p.m. until 10:30 p.m. |
| Friday, October 29, 2021: | from 3:00 p.m. until 10:30 p.m. |
| Saturday, October 30, 2021: | off |

220.     On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, his actual hours worked for that week.

221.     Mr. De La Cruz participated in the previous class action for unpaid overtime against Defendants.  Limited by the foregoing, Mr. De La Cruz may recover damages from Defendants in this action from August of 2020 onward.

## Silvia Alvarez

### *Defendants Willfully Failed to Pay Ms. Alvarez Wages for all the Hours She Worked*

222.     Plaintiff Ms. Alvarez has worked for Defendants as a janitor since 2009.  She is a current employee of Defendants.

223.     As a janitor, Ms. Alvarez's responsibilities include, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors and shampooing carpets;(v) removing potentially medical hazardous waste; and (vi) removing and recycling garbage.

224.     Defendants assigned Ms. Alvarez to service their account with Weill Cornell Medical located at 425 East 61st Street, New York, New York ("Site").  Specifically, Ms. Alvarez performed cleaning services in the following site areas:

- 11th Floor: Plaintiff serviced approximately 30 rooms, 5 hallways, 1 large waiting area and 5 bathrooms.

- 8th Floor: Plaintiff is responsible for disinfecting all the areas in the floor, which include, 15 rooms, 2 long hallways, 1 cubicle area, 1 waiting area and 7 bathrooms.

- 12th Floor:  Plaintiff is responsible for removing trash from offices on the floor and replenishing paper towels and toilet, and clean 2 bathrooms.

225.    Despite handling such a large account for Defendants, Ms. Alvarez did not receive payment for all the hours she worked. Specifically, Defendants arbitrarily limited Plaintiff's compensation to 25 hours, regardless of the number of hours she actually worked each week.

226.    To conceal their unlawful compensation practice, Defendants adjusted Ms. Alvarez's time entries to match her compensation. Consequentially, Ms. Alvarez was regularly required to perform off-the-clock unpaid work.

227.    Defendants directed and continue to direct Ms. Alvarez to work six and half (6.5) hours per day, five (5) days per week, working an average of thirty-two and one-half (32.5) hours per week.

228.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, her actual hours worked for that week.

229.    Ms. Alvarez participated in the previous class action for unpaid overtime against Defendants. Limited by the foregoing, Ms. Alvarez may recover damages from Defendants in this action from August of 2020 onward.

**Nestor R. Nunez**

***Defendants Willfully Failed to Pay Mr. Nunez Wages for all the Hours He Worked***

230.    Plaintiff Mr. Nunez has worked for Defendants as a porter since in or about June of 2014. He is a current employee of Defendants.

231.    Defendants assigned Mr. Nunez to service their account with Weill Cornell Medical Center ("Cornell"). Specifically, Mr. Nunez performs cleaning services on the 9th Floor and common areas of a building located at 425 East 61st Street, New York, New York ("Site").

232.    As porter Mr. Nunez' responsibilities include, inter alia: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) sweeping, vacuuming and mopping floors; and (v) removing and recycling garbage.

233.    Throughout his employment, Mr. Nunez was "technically" required to clock in and out at the beginning and end of his shift by calling an automated timekeeping service that tracked his time. However, this timekeeping mechanism was entirely self-serving and easily manipulated, as Defendants' payroll records continuously underreported the number of hours actively worked by Mr. Nunez.

234.    The discrepancy between the actual hours Plaintiff worked and the inaccurate "official" hours reported by Defendants caused Mr. Nunez to be significantly underpaid. Specifically, Defendants engaged in a pattern and practice of shaving off of three (3) to five (5) hours from Mr. Nunez weekly paycheck.

235.    For example, during the week of from August 15 through August 21, 2021, Defendants required Mr. Nunez to work, and Mr. Nunez did in fact work thirty-eight (38) hours according to the following schedule, without any uninterrupted meal breaks, yet Defendants only paid his for 34.75 hours of work this week:

| | |
|---|---|
| Sunday, August 15, 2021: | off |
| Monday, August 16, 2021: | from 3:00 p.m. until 10:00 p.m. |
| Tuesday, August 17, 2021: | from 3:00 p.m. until 10:00 p.m. |
| Wednesday, August 18, 2021; | from 3:00 p.m. until 10:00 p.m. |
| Thursday, August 19, 2021: | from 3:00 p.m. until 10:00 p.m. |
| Friday, August 20, 2021: | from 3:00 p.m. until 10:00 p.m. |
| Saturday, August 21, 2021: | from 2:00 p.m. until 5:00 p.m. |

236.    Defendants flagrantly violated the FLSA and NYLL in other respects as well.

237.    Further, Mr. Nunez was routinely denied his required meal break. When he did, on rare occasion take a break to eat, Defendants would interrupt him and demand that he resume working. Defendants would then fail to compensate him for the additional hours worked.

238.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, his actual hours worked for that week.

239.    Mr. Nunez participated in the previous class action for unpaid overtime against Defendants. Limited by the foregoing, Mr. Nunez may recover damages from Defendants in this action from August of 2020 onward.

## Hector V. Morales

### *Defendants Willfully Failed to Pay Mr. Morales Wages for all the Overtime Hours He Worked*

240.    Plaintiff Mr. V. Morales worked for Defendants as a porter from in or about November 2017 to in or about September 2020.

241.    Defendants assigned Mr. V. Morales to service their account with Queens Legal Aid Office located at 120-46 Queens Boulevard, Kew Gardens, New York ("Site").  Mr. V. Morales performed cleaning services for the Site's: lobby, second floor, third floor and fourth floor.

242.    As a porter for the Site, Mr. V. Morales' responsibilities included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) sweeping, vacuuming and mopping floors; and (v) removing and recycling garbage.

243.    Defendants also directed Mr. V. Morales to buff the floors for various accounts on weekends.

244.    Throughout his employment, Mr. V. Morales was "technically" required to clock in and out at the beginning and end of his shift by a timekeeping application Defendants required him to download to his phone that tracked his time.  However, this timekeeping mechanism was entirely self-serving and easily manipulated, as Defendants' payroll records continuously underreported the number of hours actively worked by Mr. V. Morales

245.    The discrepancy between the actual hours Plaintiff worked and the inaccurate "official" hours reported by Defendants caused Mr. V. Morales to be significantly underpaid. Specifically, Defendants engaged in a pattern and practice of shaving off of three (3) to five (5) hours from Mr. Morales weekly paycheck.

246.    Defendants regularly required Mr. V. Morales to work eight (8) to ten (10) hours per day, seven (7) days per week, working an average of sixty-five (65) hours per week.

247.    Despite regularly working an average of twenty-five (25) hours of overtime each week, Mr. V. Morales did not receive any payment for many of the hours he worked.

248.    For example, during the week of August 15 through August 21, 2021, Defendants required Mr. V. Morales to work, and Mr. V. Morales did in fact work sixty-five (65) hours according to the following schedule, without any uninterrupted meal breaks, yet Defendants only paid his for 45 hours of work this week:

| | |
|---|---|
| Sunday, September 15, 2019: | from 4:00 p.m. until 2:00 a.m. |
| Monday, August 15, 2019: | from 5:00 p.m. until 1:00 a.m. |
| Tuesday, August 17, 2019: | from 5:00 p.m. until 1:00 a.m. |
| Wednesday, August 18, 2019; | from 5:00 p.m. until 1:00 a.m. |
| Thursday, August 19, 2019: | from 5:00 p.m. until 1:00 p.m. |
| Friday, August 20, 2019: | from 5:00 p.m. until 1:00 p.m. |
| Saturday, August 21, 2019: | from 4:00 p.m. until 2:00 a.m. |

249.    Defendants flagrantly violated the FLSA and NYLL in other respects as well.

250.    For instance, Mr. V. Morales was also not compensated for the legally mandated spread-of-hours-pay for hours worked in excess of ten (10) hours a day, including for all seven days in the example week described above.

251.    Further, Mr. V. Morales was routinely denied his required meal break. When he did, on rare occasion take a break to eat, Defendants would interrupt him and demand that he resume working. Defendants would then fail to compensate him for the additional hours worked.

252.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, his actual hours worked for that week.

253.    Defendants also intentionally did not provide Plaintiff with a wage notice at the time of his hire that accurately contained, *inter alia*, Plaintiff's rates of pay as designated by Defendants.

254.    Mr. V. Morales did not participate in the previous class action for unpaid overtime against Defendants because he feared they would terminate his employment for joining. Mr. V. Morales was not alone on this fear, as Defendant Weisbach's retaliatory agenda was well known amongst Defendants' employees. Indeed, Mr. V. Morales had discussed Weisbach's retaliatory threats with at least two different coworkers plus one of his managers when considering whether to participate in the previous class action, and was coerced against participating and receiving any settlement award from that action out of fear of immediate termination.

## Wendi H. Ortiz

***Defendants Willfully Failed to Pay Ms. Ortiz Wages for all the Overtime Hours She Worked***

255.    Plaintiff Ms. Ortiz worked for Defendants as a porter from in or about November of 2017 until in or about September of 2020.

256.    Defendants assigned Ms. Ortiz to service their account with Plan Parenthood Borough Hall Center located at 44 Court Street, Brooklyn, New York ("Site").  Specifically, Ms. Ortiz performed cleaning services throughout the 6th Floor of the Site.

257.    As porter Ms. Ortiz's responsibilities included, *inter ali*a: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) sweeping, vacuuming and mopping floors; and (v) removing and recycling garbage.

258.    Throughout her employment, Ms. Ortiz was "technically" required to clock in and out at the beginning and end of her shift by a timekeeping application Defendants required her to download to her phone that tracked her time. However, this timekeeping mechanism was entirely self-serving and easily manipulated, as Defendants' payroll records continuously underreported the number of hours actively worked by Ms. Ortiz.

259.    The discrepancy between the actual hours Plaintiff worked and the inaccurate "official" hours reported by Defendants caused Ms. Ortiz to be significantly underpaid. Specifically, Defendants engaged in a pattern and practice of shaving off of three (3) to five (5) hours from Ms. Ortiz weekly paycheck.

260.    Defendants regularly required Ms. Ortiz to work seven (7) to eleven (11) hours per day, six (6) days per week, working an average of fifty (50) hours per week.

261.    For example, during the week of July 19 through July 25, 2020, Defendants required Ms. Ortiz to work, and Ms. Ortiz did in fact work forty-eight (48) hours according to the following schedule, without any uninterrupted meal breaks, yet Defendants only paid her for forty (40) hours of work this week:

Sunday, July 19, 2020:                    off
Monday, July 20, 2020:                    from 4:00 p.m. until 11:00 p.m.

| Tuesday, July 21, 2020: | from 4:30 p.m. until 11:00 p.m. |
|---|---|
| Wednesday, July 22, 2020: | from 4:30 p.m. until 11:00 p.m. |
| Thursday, July 23, 2020: | from 4:30 p.m. until 11:00 p.m. |
| Friday, July 24, 2020: | from 4:30 p.m. until 11:00 p.m. |
| Saturday, July 25, 2020: | from 8:00 a.m. until 7:00 p.m. |

262.    Defendants flagrantly violated the FLSA and NYLL in other respects as well.

263.    For instance, Ms. Ortiz was also not compensated for the legally mandated spread-of-hours-pay for hours worked in excess of ten (10) hours a day, including for all five days in the example week described above.

264.    Further, Ms. Ortiz was routinely denied her required meal break. When she did, on rare occasion take a break to eat, Defendants would interrupt her and demand that she resume working. Defendants would then fail to compensate her for the additional hours worked.

265.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, her actual hours worked for that week.

266.    Defendants also intentionally did not provide Plaintiff with a wage notice at the time of her hire that accurately contained, *inter alia*, Plaintiff's rates of pay as designated by Defendants.

267.    Ms. Ortiz did not participate in the previous class action for unpaid overtime against Defendants because she feared they would terminate her employment for joining. Ms. Ortiz was not alone on this fear, as Defendant Weisbach's retaliatory agenda was well known amongst Defendants' employees.

**Lemuel Morales**

***Defendants Misclassified Mr. L. Morales as a "Manager" Exempt from Overtime and Failed to Pay Him Wages at the Mandatory Statutory Rate for the Overtime Hours He Worked***.

268.    Plaintiff Mr. L. Morales worked for Defendants as a porter from in or about January of 2017 until his unlawful termination on October 15, 2021.  From in or around 2018 until the end of his tenure, Mr. Morales' title was that of a "Manager," but he was required by Defendants to primarily perform non-managerial duties.

269.    Plaintiff L. Morales was included in the class definition at the time the *Sanchez* Federal Action was filed and when the Supreme Court, New York County *Sanchez* complaint was filed. However, Plaintiff Morales ***was not*** included as a part of the class in the version of the class definition that was ultimately certified in Supreme Court, New York County.

270.    Defendants assigned Mr. L. Morales to perform a wide array of cleaning services in various  New York City jobsites.

271.    While employed by Defendants, Mr. L. Morales's responsibilities were uniformly non-managerial and included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

272.    At all relevant times, Mr. L. Morales has not been a *bona fide* "Manager" because he never exercised any managerial or supervisory authority, such as the ability to hire, fire, or discipline employees. Nor did Mr. Morales exercise discretion or independent judgment with respect to any significant matters.

273.    This was because Defendant Weisbach exercised the sole and exclusive authority with respect to decisions relating to hiring and firing, and regarding all matters of significance such that Plaintiff Morales lacked authority or discretion to deviate from Defendant Weisbach's directives.

274.    Defendants regularly directed Mr. L. Morales to work ten (10) to fourteen (14) hours per day, six (6) days per week, working an average of sixty-five (65) hours per week.

275.    For his pay each week, including the week described in the prior paragraph, Defendants paid Mr. L. Morales a flat salary of $1,175.00 each week, and which amounts to a straight-time rate of $18.08 per hour.

276.    Despite regularly working twenty-five (25) hours of overtime per week, Defendants never paid him overtime compensation for any of his hours worked in excess of forty each week, and thus failed to pay an additional $9.04 for all hours worked over forty (40) each week.

277.    Defendant did not maintain a punch clock or any other system to record hours worked by their misclassified "managers."  Mr. L. Morales, however, maintained his own records of the hours he worked for Defendant.

278.    For example, during the week of October 3 through October 9, 2021, Defendants required Mr. L. Morales to work, and Mr. L. Morales did in fact sixty-five (65) hours according to the following schedule, without any uninterrupted meal breaks:

| | |
|---|---|
| Sunday, October 3, 2021: | off |
| Monday, October 4, 2021: | from 4:00 p.m. until 2:00 a.m. |
| Tuesday, October 5, 2021: | from 4:00 p.m. until 2:00 a.m. |
| Wednesday, October 6, 2021: | from 4:00 p.m. until 3:00 a.m. |
| Thursday, October 7, 2021 | from 4:00 p.m. until 2:00 a.m. |
| Friday, October 8, 2021: | from 4:00 p.m. until 2:00 a.m. |
| Saturday, October 9, 2021: | from 8:00 a.m. until 10:00 p.m. |

279.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, his actual hours worked for that week and/or his straight and overtime rates of pay for all hours worked.

280.    Defendants also intentionally did not provide Plaintiff with a wage notice at the time of his hire that accurately contained, *inter alia*, Plaintiff's rates of pay as designated by Defendants.

281.    Defendants acted in the manner described herein so as to maximize their profits while minimizing labor costs and overhead.

282.    Mr. L. Morales did not participate in in the previous class action for unpaid overtime against Defendants because Defendant Weisbach threatened to terminate him if he joined, and because he was not included within the final class definition certified in the Supreme Court, New York County.

### Defendants' Unlawful Discrimination and Retaliation

283.    On more than one occasion, Weisbach received complaints relating to Mr. L. Morales' unpaid overtime premiums.  Nonetheless, Weisbach dismissed these complaints and to make matters worse, told Mr. L. Morales, "illegals don't get overtime" and "I keep you Mexicans not to complain and work like asses."

284.    In September of 2021, Mr. L. Morales became more persistent with his complaints. In response, Weisbach threatened Mr. L. Morales by telling him, "I'll make sure the illegals are the first to go."

285.    Soon after, Weisbach began to openly and regularly reprimand Mr. L. Morales saying "Sammy get your shit together."  Then, on October 15, 2021, Defendants terminated Mr. L. Morales.

286.     Given Defendants' treatment of Mr. L. Morales since September 2021 — including openly and regularly reprimanding and threatening to fire him — it is evident that Defendants terminated Mr. L. Morales in retaliation for his request to be paid overtime.

287.     Defendants campaign of retaliation has continued unabated. Indeed, on April 26, 2022, with knowledge that Plaintiff Mr. L. Morales and others are preparing this instant litigation, Defendant Weisbach began convening meetings with current employees - - including both Plaintiffs who are current employees, and current employees who have not yet joined this action - - to threaten further action against Plaintiffs including Mr. L. Morales. Specifically, Defendant Weisbach threatened to bring unspecified criminal action against Mr. L. Morales for supposed wrongdoing that Defendants claim Mr. L. Morales was involved with during his employment.

288.     Defendants are continuing to retaliate and discriminate against current and former Defendants' employees in an effort to intimidate them and suppress participation in this action.

**Leticia Valdez**

***Defendants Willfully Failed to Pay Ms. Valdez Wages for all the Hours She Worked***

289.     Plaintiff Ms. Valdez worked for Defendants as a porter from in or about June of 2019 until her unlawful termination on January 29, 2021.

290.     Throughout her employment, Ms. Valdez was directed to service Defendants' account with Tech Space Medical located at 41 East 11th Street, New York, New York ("Site"). Specifically, Ms. Valdez performed cleaning services at the Site's 10th Floor which has a floor area of approximately 20,000 square feet.

291.     As a porter Ms. Valdez' responsibilities include, inter alia: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) sweeping, vacuuming and mopping floors; and (v) removing

and recycling garbage.

292.    Despite handling such a large account for Defendants, Ms. Valdez did not receive payment for all the hours she worked. Specifically, Defendants arbitrarily limited Plaintiff's compensation to approximately twenty-one (21) hours, regardless of the number of hours she actually worked each week.

293.    To conceal their unlawful compensation practices, Defendants adjusted Ms. Valdez's time entries to match her compensation. Consequentially, Ms. Valdez was regularly required to perform off-the-clock unpaid work.

294.    Defendants directed Ms. Valdez to work five (5) to six (6) hours per day, five (5) days per week, working an average of between twenty-five (25) and thirty (30) hours per week.

295.    For example, during the week of October 25 through November 1, 2020, Defendants required Ms. Valdez to work, and Ms. Valdez did in fact work thirty (30) hours according to the following schedule, without any uninterrupted meal breaks, yet Defendants only paid her for twenty (20) hours of work this week:

| | |
|---|---|
| Sunday, October 25, 2020: | off |
| Monday, October 26, 2020: | from 4:00 p.m. until 10:00 p.m. |
| Tuesday, October 27, 2020: | from 4:00 p.m. until 10:00 p.m. |
| Wednesday, October 29, 2020: | from 4:00 p.m. until 10:00 p.m. |
| Thursday, August 30, 2020: | from 4:00 p.m. until 10:00 p.m. |
| Friday, October 31, 2020: | from 4:00 p.m. until 10:00 p.m. |
| Saturday, November 1, 2020: off | off |

296.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, inter alia, her actual hours worked for that week.

297.    For example, for the week above Ms. Valdez worked thirty (30) hours, Defendants only compensated her for 23.08 hours.

298.    Ms. Valdez did not participate in the previous class action for unpaid overtime against Defendants because Defendants threatened to terminate her employment if she joined.  On more than one occasion, Ms. Valdez's supervisors - - Plaintiff Nelson Hernandez and Maria (last name unknow) - - warned her that Defendant Weisbach planned to terminate employees that joined the class action in retaliation for seeking to participate in the settlement. Based on their warnings and Weisbach's threats, Ms. Valdez was coerced against participating and receiving any settlement award from that action.

***Ms. Valdez was Subjected to Discrimination Because of Her Gender, Pregnancy and Caregiver Status***

299.    In August of 2020, Ms. Valdez informed Maria that she was pregnant and requested two (2) months of parental leave commencing from her delivery date in April of 2021.  In response, Maria told Ms. Valdez not to worry and approved her request.

300.    At all relevant times, Defendants employed approximately one-hundred (100) employees for each working day during at least 20 workweeks in 2020.  In addition, Ms. Valdez worked at least 1,250 hours during the previous 12-month period and was therefore eligible for FMLA leave.

301.    In December of 2020, Ms. Valdez was diagnosed with acute pancreatitis and cholestasis of pregnancy causing her to suffer, among other things, abdominal pain and at risk for preterm labor, stillbirth and fetal loss.

302.    In early January of 2021, Ms. Valdez spent a week in the hospital receiving treatment for severe abdominal pain.

303.    Once released from the hospital, Ms. Valdez remained under the close medical care of her doctor who treated her three (3) times per week for her condition.

304.    On several occasions, Ms. Valdez informed Maria of her diagnoses, related symptoms, and required treatment.

305.    As part of Defendants' unlawful compensation practices, Defendants refused to provide their employees with sick leave benefits as required by City and State laws.

306.    Specifically, for all of the days she missed work to receive medical treatment, including the dates described in the prior paragraphs, Defendants refused to provide Ms. Valdez with any paid leave.

307.    At no time during her pregnancy did Defendants in any way advise Ms. Valdez of her rights to take FMLA leave.

### *Defendants Unlawful Retaliation and Termination*

308.    In late January of 2021, Ms. Valdez' diagnoses caused her early labor at twenty-four (24) weeks.

309.    Soon after, Ms. Valdez requested two required modifications to her approved leave request.   First, Ms. Valdez requested that her leave start date of April of 2021 advance to February of 2021 to correspond with her delivery date.   Ms. Valdez also requested to enlarge her leave period from two (2) months to (4) moths to care for her premature child.   In response, Maria told Ms. Valdez not to worry and approved her request.

310.    Contrary to Defendants' purported approvals and assurances, when Ms. Valdez attempted to return from leave, Defendants relied on shifting and contradictory reasons to conceal their refusal to reinstate her.

311.    From the start, in May of 2021, Ms. Valdez contacted Maria to confirm her timely and previously-approved return from leave, even offering to return to work one week ahead of schedule. While completely dismissing her eagerness to return to work, Maria's response was to direct Ms. Valdez with a line of questioning designed to dispute her willingness to work. Maria coupled these questions with unsolicited advice that "parents should spend more time with their child."

312.    Upon realizing that Ms. Valdez had made up her mind and continued to express her desire to return to work, Maria changed her tone from concerned to upset and started to complain about difficulties relating to securing Site coverage including transferring various porters both during Ms. Valdez's leave, and as a consequence of her request to return to work. Under this premise, Maria informed Ms. Valdez that reassigning the transferred porters was a pre-requisite to her reinstatement, denied her request to return to work, and directed Ms. Valdez to check back with her in July of 2021.

313.    As directed, Ms. Valdez contacted Maria in July of 2021 to request permission to return to work and to be placed on Defendants' schedule. However, Maria had yet another excuse - - this time, citing COVID-related delays. Maria first suggested that Ms. Valdez should look for another job, but later suggested that Ms. Valdez should check back in with her after another month.

314.    In August of 2021, Ms. Valdez contacted Maria and Plaintiff Nelson Hernandez to get to the bottom of her reinstatement or alternatively to request assignment to a different one of Defendants' many active accounts. At Weisbach's direction, Plaintiff Nelson Hernandez was forced to continue to express Defendants' parade of elaborate excuses. Specifically, at Weisbach's express direction, Plaintiff Nelson Hernandez told Ms. Valdez that she could not be reinstated because her file was "erased" from Defendants' computer. Further, Weisbach directed Plaintiff

Nelson Hernandez to inform Ms. Valdez that she was welcomed to fill out an employment application with Defendants, however, with no guarantee that her application will be expedited or that she would be hired.

315.    Defendants' refusal to reinstate Ms. Valdez after requesting parental leave and sick leave to treat her medical condition represented a clear-as-day case of discrimination against Ms. Valdez by failing to reinstate her employment when she returned from leave, culminating in her unlawful termination.

### Daniel Lara

***Defendants Misclassified Mr. Lara as a "Manager" Exempt from Overtime and Failed to Pay Him Wages at the Mandatory Statutory Rate for the Overtime Hours He Worked***.

316.    Plaintiff Mr. Lara has worked for Defendants as a porter since in about January of 2005.  Mr. Lara is ostensibly employed as a "Supervisor," but required by Defendants to primarily perform non-managerial duties.

317.    Defendants assigned Mr. Lara to service their account with Weill Cornell Medical Center ("Cornell").  Specifically, Mr. Lara performs cleaning services in six (6) floors and a Penthouse of a building located at 425 East 61st Street, New York, New York ("Site").

318.    While employed by Defendants, Mr. Lara's responsibilities have been uniformly non-managerial and include, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

319.    At all relevant times, Mr. Lara has not been a *bona fide* "Manager" because he never exercised any managerial or supervisory authority, such as the ability to hire, fire, or discipline employees. Nor does Mr. Lara exercise discretion or independent judgment with respect

to any significant matters.

320.     This was because Defendant Weisbach exercised the sole and exclusive authority with respect to decisions relating to hiring and firing, and regarding all matters of significance such that Plaintiff Lara lacked authority or discretion to deviate from Defendant Weisbach's directives.

321.     Defendants regularly direct Mr. Lara to work ten (10) to fourteen (14) hours per day, five (5) days per week, working an average of between sixty (60) and seventy (70) hours per week.

322.     For his pay each week, including the week described in the prior paragraph, Defendants paid Mr. Lara a flat weekly salary of $1,125.00 that was meant to cover only his first forty (40) hours worked per week, and which amounts to an hourly rate of between $16.08 and $18.75, depending on the number of hours he worked each week.

323.     Despite regularly working twenty (20) to thirty (30) hours of overtime per week, Defendants never paid him overtime compensation for any of his hours worked in excess of forty each week, and thus failed to pay an additional $8.65 for all hours worked over forty (40) each week.

324.     Defendant did not require Mr. Lara to punch a clock or any other system to record hours he worked. Mr. Lara, however, maintained his own records of the hours he worked for Defendant.

325.     For example, during the week of October 24, 2021 and October 30, 2021, Defendants required Mr. Lara to work, and Mr. Lara did in fact work, seventy (70) hours according to the following schedule, without any uninterrupted meal breaks:

| | |
|---|---|
| Sunday, October 24, 2021: | off |
| Monday, October 25, 2021: | from 7:00 a.m. until 9:00 p.m. |
| Tuesday, October 26, 2021: | from 7:00 a.m. until 9:00 p.m. |

| | |
|---|---|
| Wednesday, October 27, 2021: | from 7:00 a.m. until 9:00 p.m. |
| Thursday, October 28, 2021 | from 7:00 a.m. until 9:00 p.m. |
| Friday, October 29, 2021: | from 7:00 a.m. until 9:00 p.m. |
| Saturday, October 30, 2021: | off |

326.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, his actual hours worked for that week and/or his straight and overtime rates of pay for all hours worked.

327.    Mr. Lara participated in in the previous class action for unpaid overtime against Defendants.  Limited by the foregoing, Mr. Lara may recover damages from Defendants in this action from August of 2020 onward.

328.    Despite Mr. Lara continuing to work for Defendants, Defendants have learned through counsel that Mr. Lara is pursuing the instant action. As a result, Defendants began to retaliate against Mr. Lara. Specifically, on April 26, 2022, with knowledge that Plaintiff Mr. Lara and others are preparing this instant litigation, Defendant Weisbach began met with Mr. Lara and expressly threatened him that if he does not "drop the suit," Defendants will immediately terminate Mr. Lara's employment.

329.    Defendants are continuing to retaliate and discriminate against current and former Defendants' employees in an effort to intimidate them and suppress participation in this action.

## Marcelo Soria

### *Defendants Willfully Failed to Pay Mr. Soria Wages for all the Hours He Worked*

330.    Plaintiff Mr. Soria worked for Defendants as a porter from in or about February 2019 until in or about October 2021.

331.    Throughout his employment, Mr. Soria was directed to service Defendants' account with Starbucks, located at 370 7th Avenue, New York, New York ("Site").

332.    As a porter Mr. Soria's responsibilities included, inter alia: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) sweeping, vacuuming and mopping floors; and (v) removing and recycling garbage.

333.    Despite his work, Mr. Soria did not receive payment for all of his the hours. Specifically, Defendants reduced Mr. Soria's hours worked each day by one-hour, and on specific days where he was required to do deep-cleaning, Defendants reduced Mr. Soria's hours worked by approximately two and one-half hours.

334.    To conceal their unlawful compensation practice, Defendants accounted for Mr. Soria's one-hour daily reduction as a meal break.  However, Mr.  Soria did not take any meal breaks. On deep cleaning days, Defendants further shaved this time off of Mr. Soria's hours worked and refused to pay him for same.

335.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, inter alia, his actual hours worked for that week.

336.    For example, during a typical workweek, Mr. Soria worked on average twenty-seven and one-half (27.5) hours, but Defendants only compensated him for 20 hours.

337.    Mr. Soria did in fact participate in the previous class action for unpaid overtime against Defendants. Limited by the foregoing, Mr. Soria may recover damages from Defendants in this action from August of 2020 onward.

**<u>Maria Carmen Barrera Figueroa</u>**

***Defendants Willfully Failed to Pay Ms. Barrera Wages for all the Hours She Worked***

338.    Plaintiff Ms. Barrera is a current employee of Defendants. She has worked as a porter since in or about August 2019.

339.    Throughout her employment, Ms. Barrera was directed to perform weekly cleaning services at various locations.

340.    As a designated porter for these sites, Ms. Barrera's responsibilities included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

341.    Throughout her employment, Ms. Barrera was "technically" required to clock in and out at the beginning and end of her shift by using the company's mobile application and/or calling an automated timekeeping service that tracked her time.  However, this timekeeping mechanism was entirely self-serving and easily manipulated, as Defendants' payroll records continuously underreported the number of hours actively worked by Ms. Barrera.

342.    The discrepancy between the actual hours Ms. Barrera worked and the inaccurate "official" hours reported by Defendants caused Ms. Barrera to be significantly underpaid. Specifically, during the time periods referenced below, Defendants engaged in a pattern and practice of shaving from two hours and fifteen minutes (2:15) to five (5) hours off of Ms. Barrera's weekly paycheck.

343.    From approximately August 2019 to March 2020, Defendants assigned Ms. Barrera to service various accounts, which required Ms. Barrera to make multiple trips throughout the workday. Defendants did not pay Ms. Barrera for her time spent traveling between her various job sites each day.

344.    From August 2019 through September 2019, Defendants regularly required Ms. Barrera to work between four (4) hours and five (5) hours per day, five (5) days per week, working an average of between twenty-two and one-half (22.5) hours per week. In addition, Ms. Barrera spent approximately fifteen to twenty minutes each day traveling between two or three worksites, for a total average of two hours and fifteen minutes of travel time each workweek

345.    During this period, Defendants refused to pay Ms. Barrera any of her travel time.

346.    Thereafter, from October 2019 through November 2019, Defendants regularly required Ms. Barrera to work between five (5) hours and six (6) hours per day, five (5) days per week, servicing typically three locations per day. As a result, she worked an average of twenty-seven and one-half (27.5) hours per week.  In addition, Ms. Barrera spent approximately fifteen to twenty minutes each day traveling between three worksites, for a total average of approximately three hours of travel time each workweek.

347.    Also during this period, Defendants refused to pay Ms. Barrera for any of her travel time each week.

348.    Beginning December 2019 until the start of the COVID-19 pandemic in or around late March 2020, Defendants regularly required Ms. Barrera to work eight (8) hours daily shifts, five (5) days per week, servicing typically four locations per day. As a result, she worked forty (40) hours per week. In addition, during this time, Ms. Barrera spent approximately fifteen to

twenty minutes each day traveling between four worksites, for a total average of approximately four and one-half (4.5) hours of travel time each workweek.

349.    Throughout this time period, Defendants refused to pay Ms. Barrera for any of her travel time each week.

350.    Moreover, with the addition of her travel time, Ms. Barrera was working more than ten hours each day from start to finish, yet Defendants never paid her spread-of-hours pay during this time period.

351.    From approximately late March 2020 through approximately August 2020, Defendants assigned Ms. Barrera to service their account with Weil Cornell ("Cornell").

352.    While working at Cornell, Ms. Barrera did in fact receive payment for all the hours she worked per work week, because she was only working at one location, and did not have any unpaid travel time.

353.    Then, from in or around the beginning of September 2020, Defendants again assigned Ms. Barrera to service three-to-four accounts, which again required Ms. Barrera to make multiple trips throughout the workday, resulting in unpaid travel time.

354.    During this period, Defendants regularly required Ms. Barrera to work eight (8) to ten (10) hours per day, five 5 per week, working an average of forty-five (45) hours per week, plus travel time of approximately three and one-half hours (3.5) per week, for a total of 48.5 hours per week.

355.    During this period, Ms. Barrera did not receive payment for all the hours she worked. Specifically, Defendants arbitrarily reduced her Plaintiff's compensation from time to time by approximately one hour, while also refusing to pay her for her travel time, resulting in Defendants shortchanging her by three-to-four hours or more each week.

68

356.    Defendants flagrantly violated the FLSA and NYLL in other respects as well.

357.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, her actual hours worked for that week.

358.    Defendants also intentionally did not provide Plaintiff with a wage notice at the time of her hire that accurately contained, *inter alia*, Plaintiff's rates of pay as designated by Defendants.

359.    Ms. Barrerra did not participate in the Prior Class Action settlement, because she never received notice of the same.

### Maria Darquea

***Defendants Willfully Failed to Pay Ms. Darquea Wages for all the Hours She Worked***

360.    Plaintiff Ms. Darquea has been employed by Defendants as a porter from in or about 2015 to the present.

361.    From on or around August 1, 2020 to on or around April 1, 2022, Ms. Darquea was directed to perform weekly cleaning services at various locations.

362.    As a designated porter for these sites, Ms. Darquea's responsibilities included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

363.    Throughout her employment, Ms. Darquea was "technically" required to clock in and out at the beginning and end of her shift by using the company's mobile application and/or calling an automated timekeeping service that tracked her time. However, this timekeeping

mechanism was entirely self-serving and easily manipulated, as Defendants' payroll records continuously underreported the number of hours actively worked by Ms. Darquea by failing to include her travel time.

364.    That is, the discrepancy between the actual hours Ms. Darquea worked and the inaccurate "official" hours reported by Defendants caused Ms. Darquea to be underpaid. Specifically, during the time periods referenced below, Defendants engaged in a pattern and practice of shaving off approximately one (1) hour from Ms. Darquea's weekly paycheck by excluding her travel time.

365.    That is, from on or around August 1, 2020 to on or around April 1, 2022, Defendants assigned Ms. Darquea to service various accounts, which required Ms. Darquea to make multiple trips throughout a single workday, for two work days per week.

366.    During said period, Defendants regularly required Ms. Darquea to work four (4) hours per day, five (5) days per week, working approximately twenty (20) hours per workweek, plus travel time of approximately thirty (30) minutes each day when she traveled.

367.    Defendants refused to pay Ms. Darquea for the approximately one (1) hour she spent traveling between worksites each workweek.

368.    Defendants flagrantly violated the FLSA and NYLL in other respects as well.

369.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, her actual hours worked for that week.

370.    Ms. Darquea did in fact participate in the previous class action for unpaid overtime against Defendants. Limited by the foregoing, Ms. Darquea may recover damages from Defendants in this action from August of 2020 onward.

**<u>Yalila Tiguarojas</u>**

***Defendants Willfully Failed to Properly Pay Ms. Tiguarojas Wages for all the Hours She Worked***

371.    Plaintiff Ms. Tiguarojas has been employed by Defendants as a porter from in or about May 2010 to the present.

372.    As a designated porter for these sites, Ms. Tiguarojas' s responsibilities included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

373.    Throughout her employment, Ms. Tiguarojas was "technically" required to clock in and out at the beginning and end of her shift by using the company's mobile application and/or calling an automated timekeeping service that tracked her time.  However, this timekeeping mechanism was entirely self-serving and easily manipulated, as Defendants' payroll records continuously underreported the number of hours actively worked by Ms. Tiguarojas.

374.    The discrepancy between the actual hours Ms. Tiguarojas worked and the inaccurate "official" hours reported by Defendants caused Ms. Tiguarojas to be significantly underpaid. Specifically, during the time periods referenced below, Defendants engaged in a pattern and practice of shaving off between four and one-half (4.5) hours and five and one-half (5.5) hours from Ms. Tiguarojas's weekly paycheck, including *both* travel time and cutting her hours by auto-deducting her for an unpaid lunch break that she was unable to take uninterrupted.

375.    From on or around August 1, 2020 to the present, Defendants assigned Ms. Tiguarojas to service Defendants' account with Weill Cornell Imaging at New York-Presbyterian, located at 425 East 61st Street, 9th Floor, New York, NY 10065.

376.    During said period, Defendants regularly required and continue to require Ms. Tiguarojas to work eight and one-half (8.5) hours per day, five (5) days per week, totaling forty-two and one-half (42.5) hours per workweek.

377.    Further, despite Ms. Tiguarojas's right to a meal break, because of Defendants' account's constant interruptions, Ms. Tiguarojas has not and is not able to take a break every workday.  As such, Ms. Tiguarojas has only been able to take two (2) to three (3) uninterrupted meal breaks per workweek at most.

378.    As such, Ms. Tiguarojas did not receive and continues to not receive payment for all the hours she worked and continues to work. Specifically, Defendants arbitrarily limited and continue to limit Plaintiff's compensation to thirty-five (35) hours per workweek, regardless of the number of hours she actually worked and continues to work each workweek.

379.    Defendants flagrantly violated the FLSA and NYLL in other respects as well.

380.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, her actual hours worked for that week.

381.    Ms. Tiguarojas did in fact participate in the previous class action for unpaid overtime against Defendants. Limited by the foregoing, Ms. Tiguarojas may recover damages from Defendants in this action from August of 2020 onward.

## Juana Paulino

### *Defendants' Unlawful Discrimination and Retaliation*

382.    Defendants employed Plaintiff as a porter from in or about 2011 until on or around September 9, 2019.

383.    As a porter, Ms. Paulino' s responsibilities included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

384.    Throughout her employment, Defendants assigned Ms. Paulino to service Defendants' account with Weill Cornell.

385.    Throughout her employment, Defendants required Ms. Paulino to work approximately eleven (11) hours per day, five (5) to (6) days per workweek.

386.    Because it was not possible for her alone to complete the work that Defendants assigned to her for such a large physical space, Ms. Paulino worked side by side with her son, Johenry Paulino. Defendants knew of and approved of this arrangement, as Defendants routinely paid Ms. Paulino via two separate checks. Bother checks were in her name, but Defendants knew and understood that they were purporting to pay for *both* her work *and* her son's work, both of whom were paid at a single, straight-time rate of pay. In reality, this resulted in both Ms. Paulino and her son Johenry losing out on overtime compensation.

387.    As a result, for any hours that Ms. Paulino worked beyond forty (40) in a single workweek, Defendants failed to properly pay her the overtime hours owed of one and one-half (1.5) times her regular rate.

388.    Because she knew that she was underpaid, Ms. Paulino participated in the *Sanchez* settlement.[2]

---

[2] As a result, Plaintiff Paulino does not assert any wage and hour claims herein, as those terms are defined in the Prior Class Action settlement agreement.  Because the Prior Class Action settlement agreement expressly carved-out retaliation claims under both the FLSA and NYLL, Plaintiff Paulino is eligible to assert her claims herein.

389.    But prior to receiving notice of the *Sanchez* settlement, Defendants retaliated against Ms. Paulino in gross violation of the FLSA and the NYLL after she requested to paid for her overtime hours.

390.    Specifically, on or around July 11, 2019, after receiving approval from Defendants, Ms. Paulino traveled to the Dominican Republic for an extended vacation.

391.    On or around September 9, 2019, Ms. Paulino returned from the Dominican Republic and attempted to resume her normal work schedule with Defendants. At the same time, however, Ms. Paulino informed Defendants that her son would no longer be able to work alongside her via the arrangement described above.

392.    Upon arriving to Defendants' assigned account on the same day, Plaintiff Nelson Hernandez, her direct supervisor, advised Ms. Paulino that Defendant Weisbach had changed her schedule because Defendants were unwilling to pay her for her actual hours worked via a single paycheck, realizing that they would now therefore have to pay her overtime compensation at a premium.

393.    Ms. Paulino objected, and responded by asking Plaintiff Nelson Hernandez if she could return to her normal schedule and simply be paid for all hours that she worked, including by receiving overtime at her owed overtime rate.

394.    Expressing Weisbach's instructions, Plaintiff Nelson Hernandez conveyed Defendants' refusal and explained Defendants' bizarre contention that they changed her schedule because "she couldn't speak English."

395.    Ms. Paulino, flabbergasted by this revelation, asked Plaintiff Nelson Hernandez why her language barrier was suddenly an issue, considering that she had worked for Defendants for over eight years without any language-related problems.

396.    In response, Nelson advised her that Defendant Weisbach was willing to provide her with a five (5) hours per day, five (5) days per week schedule, totaling more than a fifty (50) percent decrease in her hours worked each week when compared to her longstanding schedule.

397.    Defendant Weisbach has issued similar directives to Plaintiff Nelson Hernandez for other workers, using perceived language barriers, immigration status, or other discriminatory motives as grounds to justify reducing work schedules, cutting pay, or outright terminating employees' employment.

398.    Unable to take a more than 50% pay cut, Defendants constructively discharged Ms. Paulino from her employment in retaliation for requesting to be paid overtime wages.

### Rosa Fernandez

***Defendants Willfully Failed to Properly Pay Ms. Fernandez Wages for all the Hours She Worked***

399.    Plaintiff Ms. Fernandez worked for Defendants from in or around 2013 until mid-August 2020 when Defendants terminated her employment.

400.    Throughout her employment, Ms. Fernandez was directed to perform weekly cleaning services at various locations, upwards of six different accounts.

401.    As a designated cleaner for these sites, Ms. Fernandez's responsibilities included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

402.    Throughout her employment, Ms. Fernandez was "technically" required to clock in and out at the beginning and end of her shift by using the company's mobile application and/or calling an automated timekeeping service that tracked her time.  However, this timekeeping

mechanism was entirely self-serving and easily manipulated, as Defendants' payroll records continuously underreported the number of hours actively worked by Ms. Fernandez, including failing to account for her travel time.

403.    The discrepancy between the actual hours Ms. Fernandez worked and the inaccurate "official" hours reported by Defendants caused Ms. Fernandez to be significantly underpaid based at different dates / time periods.

404.    From in or around 2014 up until the start of the COVID-19 pandemic in late March 2020, Defendants assigned Ms. Fernandez to service upwards of six accounts, each located in different physical locations/buildings, which required Ms. Fernandez to make multiple trips throughout the workday. Defendants did not pay Ms. Fernandez for her time spent traveling between her various job sites each day.

405.    Throughout this time period, Defendants regularly required Ms. Fernandez to work eight (8) hours per day, five (5) days per week, working an average of forty (40) hours per week, plus travel time of between five (5) and seven and one-half (7.5) hours per week, for a total of an average of 46.25 hours per week.

406.    Thereafter, during the COVID-19 pandemic's first wave, Defendants reduced her working hours to ten (10) hours per week, servicing two accounts, while still requiring an average of two (2) hours of unpaid travel time each week.

407.    Defendants flagrantly violated the FLSA and NYLL in other respects as well.

408.    On each occasion when Defendants paid Ms. Fernandez, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, her actual hours worked for that week.

***Defendants Retaliate Against Ms. Fernandez For Complaining About Unpaid Hours and Threaten Her and Her Husband – a Fellow Signature Employee***

409.     Making matters substantially worse, Defendants retaliated against Ms. Fernandez when she complained about their failure to pay her for all of her work, and threatened her and her husband (who also worked for Defendants) if they participated in the Prior Class Action.

410.     That is, throughout her employment, Ms. Fernandez complained to her supervisor, Christian Castillo, about Defendants' failure to pay her for all of her working time. On rare occasions, Defendants would supplement Ms. Fernandez's pay, purely subject to Defendants' on whim.

411.     In August 2020, after Ms. Fernandez had been working her reduced schedule for nearly five months, she again complained to Defendants to insist that she be paid for all hours, as she had already suffered a substantial reduction in earnings due to COVID-19.

412.     The very next day, Defendant Weisbach directed Plaintiff Nelson Hernandez to terminate Ms. Fernandez's employment, for the obviously pretextual reason that she had a problem with her "immigration status."

413.     Of course, Ms. Fernandez had been working for Defendants for over seven years, and Defendants had never previously raised any supposed questions regarding her perceived national origin or immigration status before, making clear that Defendants had clearly retaliated against her in response to her complaint to be paid for all hours of work.

414.     Defendant Weisbach directed Plaintiff Hernandez to terminate Plaintiff Ms. Fernandez for the express reason that she had been complaining too much about unpaid wages, and he wanted to "get rid of her."

415.    Defendants also intentionally did not provide Plaintiff with a wage notice at the time of her hire that accurately contained, *inter alia*, Plaintiff's rates of pay as designated by Defendants.

416.    After Ms. Fernandez was fired did not participate in the Prior Class Action settlement, because Defendants threatened to fire her husband (who also worked for Defendants) and to report her to "immigration" if she participated. As a result of Defendants' retaliation, Ms. Fernandez seeks all damages to which she's entitled for the entire statutory period plus applicable tolling.

## Victor Figueroa

### *Defendants Willfully Failed to Pay Mr. Figueroa Wages for all the Hours he Worked*

417.    Plaintiff Mr. Figueroa worked for Defendants as a janitor since on or about December 2015 until in or around mid-December 2019.

418.    As a janitor, Mr. Figueroa's responsibilities include, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors and shampooing carpets; (v) removing potentially medical hazardous waste; and (vi) removing and recycling garbage.

419.    Mr. Figueroa did not receive payment for all the hours he worked. Specifically, Defendants arbitrarily limited Plaintiff's compensation to between twenty-five (25) and thirty-five (35) hours, regardless of the number of hours he actually worked each week.

420.    From the start of his employment until in or around the end December of 2017, Defendants directed Mr. Figueroa to work six and a half (6.5) to seven (7) hours per day, seven (7) days per week, working an average of between forty-five and a half (45.5) and forty nine (49)

hours per week.

421.    During the final two years of his employment, Plaintiff Figueroa five days per week, seven to eight hours per day, but was only paid for five hours each day.

422.    During his tenure he was regularly paid only for between twenty-five (25) and thirty-five (35) hours the week, despite regularly working as many as forty nine (49) hours per week during the first two years of his employment, and later working upwards of forty (40) hours per week during the last two years of his employment.

423.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, his actual hours worked for that week.

### Defendants Retaliate Against Mr. Figueroa For Complaining About His Wages

424.    Making matters substantially worse, Defendants retaliated against Mr. Figueroa when he complained about their failure to pay him for all of his work, and lied to him about the status of the Prior Class Action and his ability to participate in the same.

425.    That is, throughout his employment, Mr. Figueroa complained to his supervisors about Defendants' failure to pay him for all of his working time.

426.    In or about early December 2019, after Mr. Figueroa complained about his wages to his supervisor, "Jose," and requested that he be compensated the corresponding minimum wage. Defendants denied his request and within a week, terminated his employment. Clearly, Defendants retaliated against him in response to his complaints to be properly compensated for his work.

427.    Defendants also intentionally did not provide Plaintiff with a wage notice at the time of his hire that accurately contained, *inter alia*, Plaintiff's rates of pay as designated by Defendants.

428.    Upon learning about the pendency of the Prior Class Action after his termination, Plaintiff Figueroa inquired with Defendants if he was eligible to participate. But when he inquired about the settlement by reaching out to his former supervisor, he was told that the settlement did not pertain to him, that it was resolved, and that he was not eligible to participate in the action because the "suit was over" and it was a "dead issue."

429.    As a result of Defendants' fraudulent and deceitful tactics, Mr. Figueroa seeks all damages to which he is entitled for the entire statutory period plus applicable tolling.

### *Karina Garcia*

***Defendants Willfully Failed to Pay Ms. Garcia Wages for all the Hours She Worked***

430.    Plaintiff Ms. Garcia was employed by Defendants as a porter from in or about 2009 to approximately December 2021.

431.    From on or around August 1, 2020 to on or around December 20, 2021, Ms. Garcia was directed to perform weekly cleaning services at various locations.

432.    As a designated porter for these sites, Ms. Garcia' s responsibilities included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

433.    Throughout her employment, Ms. Garcia was "technically" required to clock in and out at the beginning and end of her shift by using the company's mobile application and/or calling an automated timekeeping service that tracked her time.  However, this timekeeping mechanism was entirely self-serving and easily manipulated, as Defendants' payroll records continuously underreported the number of hours actively worked by Ms. Garcia by failing to include her travel

time.

434.    That is, the discrepancy between the actual hours Ms. Garcia worked and the inaccurate "official" hours reported by Defendants caused Ms. Garcia to be consistently underpaid.

435.    Specifically, during the time periods referenced below, Defendants engaged in a pattern and practice of shaving off approximately five to ten  (5-10) hours from Ms. Garcia's weekly paycheck by excluding her travel time.

436.    That is, from on or around August 1, 2020 to on or around December 20, 2021, Defendants assigned Ms. Garcia to service various accounts, which required Ms. Garcia to make multiple trips throughout a single workday, for four to five (4-5) work days per week.

437.    During said period, Defendants regularly required Ms. Garcia to work eight (8) hours per day, four to five (4-5) days per week, working approximately thirty-two to forty (32-40) hours per workweek, plus travel time of approximately one to two (1-2) hours each day when she traveled.

438.    Defendants refused to pay Ms. Garcia for the approximately five to ten (5-10) hours she spent traveling between worksites each workweek.

439.    Defendants flagrantly violated the FLSA and NYLL in other respects as well.

440.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, her actual hours worked for that week.

441.    Ms. Garcia did in fact participate in the previous class action for unpaid overtime against Defendants. Limited by the foregoing, Ms. Garcia may recover damages from Defendants in this action from August of 2020 onward.

## Jorge Tigua

***Defendants Misclassified Mr. Tigua as a "Manager" Exempt from Overtime and Failed to Pay Him Wages at the Mandatory Statutory Rate for the Overtime Hours He Worked***.

442.    Plaintiff Mr. Tigua worked for Defendants as a porter from in or about 1998 until his unlawful termination on August 2019.  During his tenure, Mr. Tigua's title was that of a "Manager," but he was required by Defendants to primarily perform non-managerial duties.

443.    Plaintiff Tigua was included in the class definition at the time the *Sanchez* Federal Action was filed and when the Supreme Court, New York County *Sanchez* complaint was filed. However, Plaintiff Tigua ***was not*** included as a part of the class in the version of the class definition that was ultimately certified in Supreme Court, New York County

444.    Defendants assigned Mr. Tigua to perform a wide array of cleaning services in various New York City jobsites.

445.    While employed by Defendants, Mr. Tigua's responsibilities were uniformly non-managerial and included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping, buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

446.    At all relevant times, Mr. Tigua has not been a *bona fide* "Manager" because he never exercised any actual managerial or supervisory authority, such as the ability to hire, fire, or discipline employees. Nor did Mr. Tigua exercise any discretion or independent judgment with respect to any significant matters.

447.    This is because Defendant Weisbach controlled all aspects of Plaintiff Tigua's employment, including by issuing *all directives* relating to employee job assignments, hiring/firing, and determining employee rates of pay.

448.    Plaintiff Tigua lacked discretion to deviate from Defendant Weisbach's directives.

449.    Instead, his primary job duty was to perform cleaning work when Defendants hourly employees were not able to complete jobs and/or when Defendants needed additional coverage on certain jobs.

450.    Defendants regularly directed Mr. Tigua to work thirteen (13) hours per day, five to six (5-6) days per week, working an average of sixty-five (65) hours per week.

451.    For his pay each week, Defendants paid Mr. Tigua a flat salary of $1,150.00 each week, and which amounts to a straight-time rate of $17.70 per hour.

452.    Despite regularly working twenty-five (25) hours of overtime per week, Defendants never paid him overtime compensation for any of his hours worked in excess of forty each week, and thus failed to pay an additional $8.85 for all hours worked over forty (40) each week.

453.    Defendant did not maintain a punch clock or any other system to record hours worked by their "managers."

454.    On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, his actual hours worked for that week and/or his straight and overtime rates of pay for all hours worked.

455.    Defendants also intentionally did not provide Plaintiff with a wage notice at the time of his hire that accurately contained, *inter alia*, Plaintiff's rates of pay as designated by Defendants.

456.    Defendants acted in the manner described herein so as to maximize their profits while minimizing labor costs and overhead.

457.    Mr. Tigua did not participate in in the previous class action for unpaid overtime against Defendants, and Defendants never provided Mr. Tigua with notice of the settlement.

Indeed, Mr. Tigua was not included within the final class definition certified in the Supreme Court, New York County, making him fully eligible to participate herein while enjoying the tolling applicable from the *filing* of the Prior Class Action.

### Nelson J. Hernandez

***Defendants Misclassified Mr. Hernandez as a "Manager" Exempt from Overtime and Failed to Pay Him Wages at the Mandatory Statutory Rate for the Overtime Hours He Worked***

458.    Plaintiff Mr. Hernandez worked for Defendants as Defendants' "Operations Manager" for over twenty-four years until his unlawful termination for participating in this action on May 5, 2022.  During his tenure, Mr. Tigua's title was that of a "Manager," but he was required by Defendants to primarily perform non-managerial duties.

459.    Plaintiff Hernandez was included in the class definition at the time the *Sanchez* Federal Action was filed and when the Supreme Court, New York County *Sanchez* complaint was filed. However, Plaintiff Hernandez ***was not*** included as a part of the class in the version of the class definition that was ultimately certified in Supreme Court, New York County

460.    Defendants assigned Mr. Hernandez to perform a wide array of cleaning services in various New York City jobsites. For his work, Defendants required Plaintiff Hernandez to be available on-call 24-hours per day, seven days per week.

461.    While employed by Defendants, Mr. Hernandez's responsibilities were uniformly non-managerial and primarily required Mr. Hernandez to travel to multiple worksites each day to perform work that was either not performed by an hourly cleaner, or work that was not performed to the satisfaction of Defendants' customers.

462.    This work included, *inter alia*: (i) cleaning and disinfecting offices, bathrooms, walls, water fountains, corridors, and other common areas; (ii) dusting furniture and electronics; (iii) polishing water fountains, corner guards, and kick plates; (iv) sweeping, vacuuming, mopping,

buffing floors, and shampooing carpets; and (v) removing and recycling garbage.

463.    At all relevant times, Mr. Hernandez has not been a *bona fide* "Manager" because he never exercised any actual managerial or supervisory authority, such as the ability to hire, fire, or discipline employees. Nor did Mr. Hernandez exercise discretion or independent judgment with respect to any significant matters.

464.    This is because Defendant Weisbach controlled all aspects of Plaintiff Hernandez's employment, including by issuing *all directives* relating to employee job assignments, hiring/firing, and determining employee rates of pay.

465.    Plaintiff Hernandez lacked discretion to deviate from Defendant Weisbach's directives. If Plaintiff Hernandez ever actually questioned Defendant Weisbach's judgment regarding, e.g., firing employees, Defendant Weisbach threatened Plaintiff Hernandez by telling him that they should "go outside and settle this" - - i.e., by threatening to physically assault Plaintiff Hernandez.

466.    After enduring many years of extreme verbal abuse, Plaintiff Hernandez simply acquiesced to Defendant Weisbach's directives to avoid further threats.

467.    At all times within the time period relevant to this action, Plaintiff Hernandez's primary job duty was to perform cleaning work when Defendants hourly employees were not able to complete jobs and/or when Defendants needed additional coverage on certain jobs.

468.    Defendants regularly directed Mr. Hernandez to work between twelve (12) and eighteen (18) hours per day, Mondays through Fridays, plus eight (8) to ten (10) hours per day on weekends, working an average of over ninety (90) hours per week.

469.    For his pay each week, Defendants paid Mr. Hernandez a flat salary. From the start of the time period relevant to this action up until in or around 2018, Defendants paid Plaintiff

Hernandez $1325 per week.

470.     From in or around mid-2018 until early 2019, Defendants paid Plaintiff Hernandez $1375 each week.

471.     From in or around mid-2019 until the end of 2021, Defendants paid Plaintiff Hernandez $1750 per week.

472.     From January 2022 until the end of his employment on May 5, 2022, Defendants paid Plaintiff Hernandez $1850 per week.

473.     Despite regularly working more than 50 (50) hours of overtime per week, Defendants never paid him overtime compensation for any of his hours worked in excess of forty each week.

474.     Defendant did not maintain a punch clock or any other system to record hours worked by their "managers."

475.     On each occasion when Defendants paid Plaintiff, Defendants intentionally failed to provide Plaintiff with a wage statement that accurately listed, *inter alia*, his actual hours worked for that week and/or his straight and overtime rates of pay for all hours worked.

476.     Defendants acted in the manner described herein so as to maximize their profits while minimizing labor costs and overhead.

477.     Mr. Hernandez did not participate in in the previous class action for unpaid overtime against Defendants, as Defendants never provided Mr. Hernandez with notice of the settlement.

***Defendants Discriminate Against Mr. Hernandez by Creating a Hostile Work Environment***

478.     Throughout his employment, Defendant Weisbach interacted with Plaintiff Hernandez every single day, multiple times per day.

479.    Despite having worked for Defendants for over twenty-four years, Defendant Weisbach nevertheless carried on an unrelenting and cruel hostile relationship with Plaintiff Hernandez, discriminating against him for the entirety of his employment on the basis of his national origin / race.

480.    That is, on a near-daily basis, Defendant Weisbach referred to Plaintiff Hernandez by using the derogatory racist term, "spic."

481.    Moreover, whenever openly and aggressively complaining to Plaintiff Hernandez about any given Hispanic member of Defendants' workforce, Defendant Weisbach routinely referred to them as "your people" - - grouping all people of Hispanic descent together as one identity, and complaining about "you people."

482.    Defendant Weisbach commonly referred to Defendants' Hispanic workforces as "stupid fucking Mexicans," or "morons" who could not handle simple job directives.

483.    Plaintiff Hernandez was forced to endure Defendants' racially discriminatory hostile work environment because if Plaintiff Hernandez ever worked up the courage to stand up for himself or for his fellow Hispanic employees, Defendant Weisbach brazenly threatened to physically assault Plaintiff Hernandez, inviting him to "take it outside" and fight.

484.    Defendant Weisbach's abusive, discriminatory tactics forced Plaintiff Hernandez to bend to Defendant Weisbach's will, to work excessive hours while remaining on-call 24/7, and to lose his will to leave Defendants' employment.

485.    As described immediately below, it was only after learning about the growing number of Plaintiffs who were prepared to stand up for their rights and the rights of others that Plaintiff Hernandez developed enough courage in the face of Defendant Weisbach's yearslong abuse to join this action, ultimately to his own peril.

***Defendants Retaliate Against Mr. Hernandez for his Participation in this Action***

486.    As described above, Defendants were made aware of this action, through counsel, as early as November 2021.

487.    However, even after agreeing to attempt to resolve this matter pre-suit via a private mediation, Defendants did not become aware of Plaintiff Hernandez's participation in this action until the morning of the mediation, May 3, 2022.

488.    When the parties met during an initial joint session on the morning of the mediation, Defendant Weisbach became visibly enraged upon seeing Mr. Hernandez sitting next to Plaintiffs' legal team. That, is Defendant Weisbach's hands began shaking, his face became red, and he immediately began feverishly sending text messages.

489.    Again, the matter was not resolved at mediation, and the next day, Plaintiff Hernandez returned to work to continue performing his responsibilities.

490.    On the evening of May 4, 2022 - - the next day after the mediation session - - Defendants' Human Resources Manager, Gracie Rodriguez, sent Plaintiff Hernandez an email notifying that he was required to attend a "mandatory meeting" at Defendants' corporate offices the next day at 1:00 p.m.

491.    The next day, on May 5, 2022, Plaintiff Hernandez met with Ms. Rodriguez and Henry Jurado - - a man that Plaintiff Hernandez soon learned would become his replacement.

492.    During the meeting, Ms. Rodriguez notified Plaintiff Hernandez that she was "conducting an investigation, and it's going to end soon," and that as a result, she wanted to know the identity of two individuals: "Carlos and Carla."

493.    These two individuals - - Carlos and Carla - - were former employees of Defendants who worked for Signature from in or around 2009 until some time in mid-2021. They were also Plaintiff Hernandez's brother-in-law and sister-in-law (i.e., the brother and sister of Mr. Hernandez's wife, Plaintiff Karina Garcia).

494.    Ms. Rodriguez stated that she was going to ask Plaintiff Hernandez additional questions about the circumstances surrounding Carlos and Carla's work for Signature. In response, Plaintiff Hernandez - - knowing fully well that Ms. Rodriguez was present at the parties' mediation a mere two days earlier, and knowing further that she observed Plaintiff Hernandez at the parties' joint session, with counsel present - - requested his right to have his counsel present for any further questions that Ms. Rodriguez was going to ask relating to any so-called "investigation" into Plaintiff Hernandez.

495.    Without missing a beat, Ms. Rodriguez responded immediately by stating "okay well, you're going to be separate from the company."

496.    Ms. Rodriguez then required Plaintiff Hernandez to return all of Defendants' company property in his possession, and escorted him out of the building.

497.    Defendants plainly retaliated against Plaintiff Hernandez for his participation in this action by terminating his employment a mere two days after his attendance at the mediation session.

498.    Plaintiff Hernandez requested that Ms. Rodriguez provide him with a reason for his termination.

499.    In response, Ms. Rodriguez stated that she would "mail him a letter" with an explanation.

500.    Plaintiff Hernandez has not yet received any such letter, nor any other explanation for Defendants' justification for terminating his employment after 24-years of tireless service.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS
### *Unpaid Overtime under the FLSA*

501.    Plaintiffs Ramales, Rodriguez, Andrade, Rivandeneira, Rosado, V. Morales, Ortiz, L. Morales, Lara, Barrera, Tiguarojas, Fernandez, Figueroa, Garcia, Tigua, Hernandez and FLSA Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

502.    29 U.S.C. § 207(a) requires employers to compensate their employees at a rate not less than one and one-half times their regular rate of pay for all hours worked exceeding forty in a workweek.

503.    As described above, Defendants are "employers" within the meaning of the FLSA, while Plaintiffs and FLSA Plaintiffs are "employees" within the meaning of the FLSA.

504.    Plaintiffs and FLSA Plaintiffs worked in excess of forty hours per week, yet Defendants failed to compensate Plaintiffs and FLSA Plaintiffs in accordance with the FLSA's overtime provisions.

505.    Defendants willfully violated the FLSA.

506.    Plaintiffs and FLSA Plaintiffs are entitled to overtime pay for all hours worked per week in excess of forty at the rate of one and one-half times their respective regular rates of pay.

507.    Plaintiffs and FLSA Plaintiffs are also entitled to liquidated damages, interest, attorneys' fees, and costs for Defendants' violations of the FLSA's overtime provisions.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS
### *Unpaid Overtime under the NYLL and the NYCCRR*

508.    Plaintiffs Ramales, Rodriguez, Andrade, Rivandeneira, Rosado, V. Morales, Ortiz, L. Morales, Lara, Barrera, Tiguarojas, Fernandez, Figueroa, Garcia, Tigua, and Hernandez, Rule 23 Plaintiffs, repeat, and any FLSA Plaintiff(s) who opts-into this action repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

509.    N.Y. Lab. Law § 160 and 12 NYCCRR § 142-2.2 require employers to compensate their employees at a rate not less than one and one-half times their regular rate of pay, or one and one-half times the minimum wage rate, if greater, for all hours worked exceeding forty in a workweek.

510.    Defendants are "employers" within the meaning of the NYLL and the NYCCRR, while Plaintiffs, Rule 23 Plaintiffs and any FLSA Plaintiff(s) who opts-into this action are "employees" within the meaning of the NYLL and the NYCCRR.

511.    Plaintiffs, Rule 23 Plaintiffs and any FLSA Plaintiff(s) who opts-into this action worked in excess of forty hours in a workweek, yet Defendants failed to compensate them in accordance with the NYLL's and the NYCCRR's overtime provisions.

512.    Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action are entitled to overtime pay for all hours worked per week in excess of forty at the rate of one and one-half times their regular rate of pay, or one and one-half the minimum wage rate, if greater. Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action are also entitled to liquidated damages, interest, attorneys' fees, and costs for Defendants' violations of the NYLL's and NYCCRR's overtime provisions.

## THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
### *Unpaid Wages under the NYLL*

513.    Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

514.    NYLL § 663(1) provides in part "[i]f any employee is paid by his or her employer less than the wage to which he or she is entitled . . . he or she will recover in a civil action the amount of such underpayments. . . ."

515.    Defendants willfully failed to compensate Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action with wages for all the hours worked under forty per week.  As result, Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action are entitled to payment of these hours at their regular rate of pay.

516.    Specifically, Defendant's failure to pay these hours – known as "gap time" wages – is prohibited by Section 193 of the New York Labor Law which expressly prohibits an employer from making unauthorized deductions from employees' wages.

517.    Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action are also entitled to liquidated damages, interest, attorneys' fees, and costs for Defendants' violations of the NYLL.

## FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### *Failure to pay Spread-of-Hours in Violation of the NYCRR*

518.    Plaintiffs Ramales, Rodriguez, Andrade, Rivandeneira, Rosado, V. Morales, Ortiz, Barrera, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

519.     Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action were regularly required to work in excess of ten (10) hours a day without being compensated for the legally mandated spread of hours pay.

520.     This practice is in violation of 12 NYCCRR § 142-2.4.

521.     By the foregoing reasons, Defendants are liable to the Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action in an amount to be determined at trial, plus liquidated damages in the amount equal to the amount of unpaid wages, interest, attorneys' fees and costs.

**<u>FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS</u>**
*<u>Failure to Furnish Proper Wage Statements in Violation of the NYLL</u>*

522.     Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

523.     N.Y. Lab. Law § 195(3) requires that employers furnish employees with wage statements containing accurate, specifically enumerated criteria on each occasion when the employer pays wages to the employee.

524.     Defendants are "employers" within the meaning of the NYLL, while Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action are "employees" within the meaning of the NYLL and the NYCCRR.

525.     As described above, Defendants, on each payday, failed to furnish Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action s, with accurate wage statements containing the criteria required under the NYLL.

526.     Pursuant to NYLL § 198(1-d), Defendants are liable to Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action in the amount of $250.00 for each workday that the violations occurred, up to a statutory cap of $5,000.00.

**SIXTH CLAIM FOR RELIEF AGAINST DEFENDANTS**
*Failure to Furnish Proper Wage Notice in Violation of the NYLL*

527.     Plaintiffs Rodriguez, Rosado, V. Morales, Ortiz, L. Morales, Valdez, Soria, Barrera, Figueroa, Garcia, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

528.     NYLL § 195(1) requires that employers provide employees with a wage notice at the time of hire containing accurate, specifically enumerated criteria.

529.     As described above, Defendants are "employers" within the meaning of the NYLL, while Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiff(s) who opts-into this action, are "employees" within the meaning of the NYLL.

530.     As also described above, Defendants failed to furnish Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiffs(s) who opts-into this action with any wage notice at hire, let alone one that accurately contained all of the criteria required under the NYLL.

531.     Pursuant to NYLL § 198(1-b), Defendants are liable to Plaintiffs, Rule 23 Plaintiffs, and any FLSA Plaintiffs(s) who opts-into this action in the amount of $50.00 for each workday after the violations initially occurred, up to a statutory cap of $5,000.00.

## SEVENTH CLAIM FOR RELIEF BY PLAINTIFFS AGAINST DEFENDANTS
### *Retaliation under the FLSA*

532.    Plaintiffs Ramales, Rodriguez, Rosado, V. Morales, Ortiz, L. Morales, Valdez, Lara, Paulino, Fernandez, Lara, Figueroa, and Hernandez repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

533.    The Fair Labor Standards Act § 215(a)(3) makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . related to" FLSA's provisions.

534.    As stated above, Defendants retaliated against Plaintiffs Ramales, Rosado, V. Morales, Ortiz, L. Morales, Valdez, Fernandez, Lara, Figueroa, and Hernandez by threatening their employment if they participated in the Prior Class Action settlement, thereby intimidating and coercing them against participation in same.

535.    In addition, as stated at length above, Plaintiff Ms. Rodriguez made several complaints to Defendants about their unlawful compensation practices.  In August of 2021, Defendants' principal, Defendant Weisbach, responded to Ms. Rodriguez by telling her, "you don't work fast enough" and "if you don't like it, feel free to go." Soon after, Weisbach deployed a retaliatory campaign against Ms. Rodriguez that consisted of scrutinizing her work, reprimanding her, and pressuring her to work faster.

536.    On October 15, 2021, Defendants falsely and deliberately accused Ms. Rodriguez of wage theft and terminated her employment.  Yet this alleged reason for her termination was entirely pretextual in nature, as in fact, Defendants terminated Ms. Rodriguez solely in retaliation for her complaint about her unpaid wages.

537.    As stated at length above, in mid-September of 2021, Plaintiff Mr. L. Morales complained to Defendants about his unpaid overtime hours. Defendant Weisbach became visibly angered by Mr. L. Morales' inquiry and began to make derogatory comments about his race and national origin, and threatened he would terminate him.

538.    On October 15, 2021, Mr. L. Morales was terminated on pretextual grounds for engaging in protected activity.  The temporal proximity between Plaintiffs' complaints and their abrupt termination give rise to an inference of retaliation.

539.    As described above, on May 5, 2022, Defendants terminated Plaintiff Hernandez's employment in retaliation for his participation in this action, specifically including his attendance at the parties' May 3, 2022 mediation.

540.    To the extent that Defendant Weisbach engaged in the retaliatory actions complained of herein, Defendant Signature is vicariously liable for the retaliatory actions of their employees.

541.    As described above, Defendants retaliated against Ms. Paulino when - - after notifying Defendants that she would no longer be willing to split her paycheck with her son (who also worked for Defendants) - - she requested to be reinstated to her full schedule and to be paid overtime compensation by terminating her employment.

542.    Defendants' FLSA retaliation was a willful violation of the law.

543.    By reason of the foregoing, Defendants are liable to Plaintiffs in an amount to be determined at trial, plus liquidated damages, costs, and attorney's fees.

## EIGHTH CLAIM FOR RELIEF BY PLAINTIFFS AGAINST DEFENDANTS
### *Retaliation under the NYLL*

544.    Plaintiffs Ramales, Rodriguez, Rosado, V. Morales, Ortiz, L. Morales, Valdez, Lara, Paulino, Lara, Fernandez, Figueroa, and Hernandez repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

545.    New York Labor Law § 215(1) provides that "No employer ... shall discharge, penalize, or in any other manner discriminate against any employee because such employee has made a complaint to his employer...that the employer has violated any provision of this chapter [the Labor Law]."

546.    Specifically, an employer retaliates by "threatening to contact or contacting United States immigration authorities or otherwise reporting or threatening to report an employee's suspected citizenship or immigration status." (*Id.*)

547.    As stated above, Defendants retaliated against Plaintiffs Ramales, Rosado, V. Morales, Ortiz, L. Morales, Valdez, Fernandez Lara, Figueroa, and Hernandez by threatening their employment if they participated in the Prior Class Action settlement, thereby intimidating and coercing them against participation in same

548.    Further, as stated at length above, in mid-September of 2021, Plaintiff Mr. L. Morales complained to Defendants about his unpaid overtime hours. Defendant Weisbach became visibly angered by Mr. L. Morales' inquiry and began to make derogatory comments about his race and national origin.

549.    In addition to threatening to terminate Mr. L. Morales' employment,  Weisbach threatened Mr. L. Morales with deportation by telling him: "I'll make sure to the illegals are the first to go."

550.    On October 15, 2021, Mr. L. Morales was terminated on pretextual grounds for engaging in protected activity.  The temporal proximity between Plaintiffs' complaints and their abrupt termination give rise to an inference of retaliation.

551.    As stated at length above, Plaintiff Ms. Rodriguez made several complaints to Defendants about their unlawful compensation practices.  In August of 2021, Defendants' principal Weisbach responded to Ms. Rodriguez by telling her, "you don't work fast enough" and "if you don't like it, feel free to go." Soon thereafter, Weisbach deployed a retaliatory campaign against Ms. Rodriguez that consisted of scrutinizing her work, reprimanding her and pressuring her to work faster.

552.    On October 15, 2021, Defendants falsely and deliberately accused Ms. Rodriguez of wage theft and terminated her employment.  Yet this alleged reason for her termination was entirely pretextual in nature, as in fact, Defendants terminated Ms. Rodriguez solely in retaliation for her complaint about her unpaid wages.

553.    As described above, on May 5, 2022, Defendants terminated Plaintiff Hernandez's employment in retaliation for his participation in this action, specifically including his attendance at the parties' May 3, 2022 mediation.

554.    To the extent that Defendant Weisbach engaged in the retaliatory actions complained of herein, Defendant Signature is vicariously liable for the retaliatory actions of their employees.

555.    As described above, Defendants retaliated against Ms. Paulino when - - after notifying Defendants that she would no longer be willing to split her paycheck with her son (who also worked for Defendants), she requested to be reinstated to her full schedule and to be paid overtime compensation by terminating her employment.

556.    As described above, Defendants retaliated against Ms. Fernandez, after she requested to be paid for all hours of work in August 2020, by terminating her employment.

557.    By reason of the foregoing, Defendants are liable to Plaintiffs in an amount to be determined at trial, plus liquidated damages, costs, and attorney's fees.

## NINTH CLAIM FOR RELIEF BY PLAINTIFFS
## MR. L. MORALES, MS. FERNANDEZ, AND MS. PAULIO ONLY
## AGAINST DEFENDANTS
### *Discrimination and Retaliation under the NYCHRL*

558.    Plaintiff Mr. Morales, Ms. Fernandez, Ms. Paulino, and Mr. Hernandez repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

559.    The NYCHRL prohibits discrimination in the terms, conditions, and privileges of employment with respect to an individual's immigration status and retaliation for objecting to this unlawful conduct.

560.    As set forth above, Defendants discriminated against Plaintiff Mr. L. Morales because of his national origin, race and immigration status, and retaliated against him for engaging in protected activity. Defendants refused to pay Plaintiff with required overtime premiums because "Illegals don't get overtime."

561.    Moreover, Weisbach revealed why Mr. L. Morales' complaint made him so angry by telling him "I keep you Mexicans not to complain and work like asses."

562.    Over the course of one month, Weisbach went to great lengths to create a hostile work environment for Mr. L. Morales. First, Weisbach remained undeterred and continued to spew offensive race or national origin-based remarks against Mr. Morales. Further, Weisbach began to openly and regularly reprimand Mr. L. Morales by saying "Sammy get your shit together."

563.    October 15, 2021, Defendants terminated Mr. L. Morales. The temporal proximity between Mr. L. Morales' complaint and his abrupt termination give rise to an inference of retaliation.  Moreover, the termination occurred under circumstances that give  rise to an inference of discrimination.

564.    As described above, Defendants also discriminated against Ms. Fernandez based on Defendants' perception of Ms. Fernandez's national origin and/or immigration status, when - - in late August 2020 - - her manager, Nelson Hernandez, at Weisbach's direction, terminated her employment because, in Weisbach's words, she needed to "fix her immigration status."

565.    As set forth above, Defendants discriminated against Plaintiff Ms. Paulino because of her national origin and race and retaliated against her for engaging in protected activity. Defendants reduced Ms. Paulino's hours because "couldn't speak English."

566.    As alleged above, Defendants created a discriminatory hostile work environment through Defendant Weisbach against Plaintiff Hernandez, motivated by Defendant Weisbach's mistreatment of Plaintiff Hernandez and his fellow Hispanic colleagues.

567.    On or around September 9, 2019, Defendants terminated Ms. Paulino.

568.    As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiffs Mr.  Morales, Ms. Fernandez, and Ms. Paulino have suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, physical and emotional pain and suffering and loss of earnings, for which they are entitled to an award of monetary damages and other relief.

**TENTH CLAIM FOR RELIEF BY PLAINTIFF**
**MS. VALDEZ ONLY AGAINST DEFENDANTS**
*FMLA Retaliation in Violation of 29 U.S.C § 2615(a)(2)*

569.     Plaintiff Ms. Valdez repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

570.     As set forth above, Defendants were unhappy that Ms. Valdez had become pregnant, and that this pregnancy required her to take FMLA leave.

571.     Upon returning from leave, Defendants abruptly rescinded their approval of Ms. Valdez' FMLA leave and retaliated against her by refusing to reinstate her employment.

572.      As a direct and proximate result of Defendants' violation of the FMLA, Ms. Valdez has suffered, and continues to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

**ELEVENTH CLAIM FOR RELIEF BY PLAINTIFF**
**MS. VALDEZ ONLY AGAINST DEFENDANTS**
*Discrimination on the Basis of Gender, Familial Status and*
*Caregiver Status in Violation of the NYSHRL and NYCHRL*

573.     Plaintiff Ms. Valdez repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

574.     The NYSHRL and NYCHRL prohibit discrimination in the terms, conditions, and privileges of employment on the basis of an individual's gender, caregiver status and familial status.

575.     Plaintiff Ms. Valdez was an "employee" within the meaning of the NYSHRL and the NYCHRL, while the Defendants are "employers" and "persons."

576.    Specifically, throughout the course Ms. Valdez's pregnancy, Defendants refused to provide her with the required sick leave benefits to treat her medical conditions, care for her premature child, and gave her less favorable terms and conditions of employment than her male counterparts.  In furtherance of their discriminatory conduct, Defendants retaliated against  Ms. Valdez by refusing to reinstate her employment

577.    By engaging in the foregoing conduct, Defendants have violated Ms. Valdez's rights under the NYSHRL and NYCHRL.

578.    As a direct and proximate result of Defendants' violation of the NYSHRL and NYCHRL, Ms. Valdez has suffered, and continues to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

### TWELFTH CLAIM FOR RELIEF BY PLAINTIFF MS. VALDEZ ONLY AGAINST DEFENDANTS
*Aiding and Abetting in Violation of the NYCHRL against Defendants*

579.    Plaintiff Ms. Valdez repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

580.    As set forth above, Defendants had notice that their supervisors were engaging in discriminatory and retaliatory practices when they refused to reinstate Ms. Valdez when she returned form leave, but rather than stop such unlawful practices from continuing, they aided and abetted this type of behavior by turning a blind eye to the unlawful conduct.

581.    Defendants willfully aided and abetted to the discriminatory and retaliatory employment practices Plaintiff was forced to endure in violation of the NYCHRL.

582.    As a direct and proximate result of Defendants' violation of the NYCHRL, Ms. Valdez has suffered, and continues to suffer, monetary and/or economic damages, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## DEMAND FOR A JURY TRIAL

583.    Pursuant to FRCP 38(b), Plaintiffs, FLSA Plaintiffs, and Rule 23 Plaintiffs demand a trial by jury in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, FLSA Plaintiffs, and Rule 23 Plaintiffs demand judgment against Defendants as follows:

A.    A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned United States and New York State laws;

B.    Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

C.    An order restraining Defendants from any retaliation against Plaintiffs, FLSA Plaintiffs, and/or Rule 23 Plaintiffs for participation in any form in this litigation;

D.    Designation of this action as an FLSA collective action on behalf of Plaintiffs and FLSA Plaintiffs and prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to the FLSA Plaintiffs, apprising them of the pendency of this action, permitting them to assert timely FLSA

claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b), and tolling of the statute of limitations;

E.      Certification of the claims brought in this case under the NYLL as a class action pursuant to FRCP 23;

F.      Designation of Plaintiffs and their counsel as class/collective action representatives under the FRCP and the FLSA;

G.      All damages that Plaintiffs, FLSA Plaintiffs, and Rule 23 Plaintiffs have sustained as a result of the Defendants' conduct, including all unpaid wages and any shortfall between wages paid and those due under the law that Plaintiffs, FLSA Plaintiffs, and Rule 23 Plaintiffs would have received but for Defendants' unlawful payment practices;

H.      Liquidated damages and any other statutory penalties as recoverable under the FLSA and NYLL;

I.      Awarding Plaintiffs, FLSA Plaintiffs, and Rule 23 Plaintiffs their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs, and an award of a service payment to Plaintiffs;

J.      Awarding Plaintiffs with service awards for their role as class action representatives and in recognition for their dedication to the Rule 23 Plaintiffs and their willingness to come forward as the lead Plaintiffs on behalf of the FLSA Plaintiffs and Rule 23 Plaintiffs;

K.      Granting an award of damages to be determined at trial to compensate Plaintiffs Ms. Rodriguez, Ms. Valdez and Mr. L. Morales for emotional distress and/or mental anguish in connection with their claims;

L.      Granting an award of damages to be determined at trial to compensate Plaintiff Ms. Rodriguez and Mr. L. Morales for harm to their professional and personal reputations and loss of career fulfillment in connection with their claims;

M.      Granting an award of punitive damages to be determined at trial to compensate Plaintiff Ms. Rodriguez, Ms. Valdez and Mr. L. Morales for Defendants' discriminatory and retaliatory conduct;

N.      Pre-judgment and post-judgment interest, as provided by law; and

O.      Granting Plaintiffs, FLSA Plaintiffs, and Rule 23 Plaintiffs such other and further relief as this Court finds necessary and proper.

Dated: New York, New York
       May 16, 2022

Respectfully submitted,

**JOSEPH & NORINSBERG, LLC**

By: _____
JON L. NORINSBERG, ESQ.
BENNITTA L. JOSEPH, ESQ.
MICHAEL R. MINKOFF, ESQ.
DIEGO O. BARROS, ESQ.
110 East 59th Street, Suite 3200
New York, New York 10022
Tel.: (212) 227-5700
Fax: (212) 656-1889
jon@norinsberglaw.com;
bennitta@employeejustice.com;
michael@employeejustice.com; and
diego@norinsberglaw.com
*Attorneys for Plaintiffs and the Putative Collectives and Classes*